(Slip Opinion) OCTOBER TERM, 2011 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HOWES, WARDEN *v.* FIELDS

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 10–680.   Argued October 4, 2011—Decided February 21, 2012

Respondent Fields, a Michigan state prisoner, was escorted from his prison cell by a corrections officer to a conference room where he was questioned by two sheriff's deputies about criminal activity he had allegedly engaged in before coming to prison.  At no time was Fields given *Miranda* warnings or advised that he did not have to speak with the deputies.  As relevant here:  Fields was questioned for between five and seven hours; Fields was told more than once that he was free to leave and return to his cell; the deputies were armed, but Fields remained free of restraints; the conference room door was sometimes open and sometimes shut; several times during the interview Fields stated that he no longer wanted to talk to the deputies, but he did not ask to go back to his cell; after Fields confessed and the interview concluded, he had to wait an additional 20 minutes for an escort and returned to his cell well after the hour when he generally retired.

  The trial court denied Fields' motion to suppress his confession under *Miranda* v. *Arizona*, 384 U. S. 436, and he was convicted.  The Michigan Court of Appeals affirmed, rejecting Fields' contention that his statements should have been suppressed because he was subjected to custodial interrogation without a *Miranda* warning.  The United States District Court for the Eastern District of Michigan subsequently granted Fields habeas relief under 28  U. S. C. §2254(d)(1).  Affirming, the Sixth Circuit held that the interview was a custodial interrogation within the meaning of *Miranda*, reasoning that *Mathis* v. *United States*, 391 U. S. 1, "clearly established," §2254(d)(1), that isolation from the general prison population, combined with questioning about conduct occurring outside the prison, makes any such interrogation custodial *per se*.

Syllabus

*Held*:

    1. This Court's precedents do not clearly establish the categorical rule on which the Sixth Circuit relied. The Court has repeatedly declined to adopt any such rule. See, *e.g.*, *Illinois* v. *Perkins*, 496 U. S. 292. The Sixth Circuit misread *Mathis,* which simply held, as relevant here, that a prisoner who otherwise meets the requirements for *Miranda* custody is not taken outside the scope of *Miranda* because he was incarcerated for an unconnected offense. It did not hold that imprisonment alone constitutes *Miranda* custody. Nor does the statement in *Maryland* v. *Shatzer*, 559 U. S. \_\_\_, \_\_\_, that "[n]o one questions that [inmate] Shatzer was in custody for *Miranda* purposes" support a *per se* rule. It means only that the issue of custody was not contested in that case. Finally, contrary to respondent's suggestion, *Miranda* itself did not hold that the inherently compelling pressures of custodial interrogation are always present when a prisoner is taken aside and questioned about events outside the prison walls. Pp. 4–7.

    2. The Sixth Circuit's categorical rule—that imprisonment, questioning in private, and questioning about events in the outside world create a custodial situation for *Miranda* purposes—is simply wrong. Pp. 8–13.

    (a) The initial step in determining whether a person is in *Miranda* custody is to ascertain, given "all of the circumstances surrounding the interrogation," how a suspect would have gauged his freedom of movement. *Stansbury* v. *California*, 511 U. S. 318, 322, 325. However, not all restraints on freedom of movement amount to *Miranda* custody. See, *e.g.*, *Berkemer* v. *McCarty*, 468 U. S. 420, 423. *Shatzer,* distinguishing between restraints on freedom of movement and *Miranda* custody, held that a break in *Miranda* custody between a suspect's invocation of the right to counsel and the initiation of subsequent questioning may occur while a suspect is serving an uninterrupted term of imprisonment. If a break in custody can occur, it must follow that imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda.* At least three strong grounds support this conclusion: Questioning a person who is already in prison does not generally involve the shock that very often accompanies arrest; a prisoner is unlikely to be lured into speaking by a longing for prompt release; and a prisoner knows that his questioners probably lack authority to affect the duration of his sentence. Thus, service of a prison term, without more, is not enough to constitute *Miranda* custody. Pp. 8–12.

    (b) The other two elements in the Sixth Circuit's rule are likewise insufficient. Taking a prisoner aside for questioning may necessitate some additional limitations on the prisoner's freedom of move-

Syllabus

ment, but it does not necessarily convert a noncustodial situation into *Miranda* custody. Isolation may contribute to a coercive atmosphere when a nonprisoner is questioned, but questioning a prisoner in private does not generally remove him from a supportive atmosphere and may be in his best interest. Neither does questioning a prisoner about criminal activity outside the prison have a significantly greater potential for coercion than questioning under otherwise identical circumstances about criminal activity within the prison walls. The coercive pressure that *Miranda* guards against is neither mitigated nor magnified by the location of the conduct about which questions are asked. Pp. 12–13.

3. When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. The record in this case reveals that respondent was not taken into custody for *Miranda* purposes. While some of the facts lend support to his argument that *Miranda*'s custody requirement was met, they are offset by others. Most important, he was told at the outset of the interrogation, and reminded thereafter, that he was free to leave and could go back to his cell whenever he wanted. Moreover, he was not physically restrained or threatened, was interviewed in a well-lit, average-sized conference room where the door was sometimes left open, and was offered food and water. These facts are consistent with an environment in which a reasonable person would have felt free to terminate the interview and leave, subject to the ordinary restraints of life behind bars. Pp. 13–16.

617 F. 3d 813, reversed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, and KAGAN, JJ., joined. GINSBURG, J., filed an opinion concurring in part and dissenting in part, in which BREYER and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–680

_____

## CAROL HOWES, WARDEN, PETITIONER *v.* RANDALL LEE FIELDS

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[February 21, 2012]

JUSTICE ALITO delivered the opinion of the Court.

The United States Court of Appeals for the Sixth Circuit held that our precedents clearly establish that a prisoner is in custody within the meaning of *Miranda* v. *Arizona*, 384 U. S. 436 (1966), if the prisoner is taken aside and questioned about events that occurred outside the prison walls. Our decisions, however, do not clearly establish such a rule, and therefore the Court of Appeals erred in holding that this rule provides a permissible basis for federal habeas relief under the relevant provision of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U. S. C. §2254(d)(1). Indeed, the rule applied by the court below does not represent a correct interpretation of our *Miranda* case law. We therefore reverse.

I

While serving a sentence in a Michigan jail, Randall Fields was escorted by a corrections officer to a conference room where two sheriff's deputies questioned him about allegations that, before he came to prison, he had engaged in sexual conduct with a 12-year-old boy. In order to get to the conference room, Fields had to go down one floor and

pass through a locked door that separated two sections
of the facility. See App. to Pet. for Cert. 66a, 69a. Fields
arrived at the conference room between 7 p.m. and 9 p.m.[1]
and was questioned for between five and seven hours.[2]

At the beginning of the interview, Fields was told that
he was free to leave and return to his cell. See *id.,* at 70a.
Later, he was again told that he could leave whenever he
wanted. See *id.,* at 90a. The two interviewing deputies
were armed during the interview, but Fields remained free
of handcuffs and other restraints. The door to the confer-
ence room was sometimes open and sometimes shut. See
*id.,* at 70a–75a.

About halfway through the interview, after Fields had
been confronted with the allegations of abuse, he became
agitated and began to yell. See *id.,* at 80a, 125a. Fields
testified that one of the deputies, using an expletive, told
him to sit down and said that "if [he] didn't want to coop-
erate, [he] could leave." *Id.,* at 89a; see also *id.,* at 70a–
71a. Fields eventually confessed to engaging in sex acts
with the boy. According to Fields' testimony at a suppres-
sion hearing, he said several times during the interview
that he no longer wanted to talk to the deputies, but he
did not ask to go back to his cell prior to the end of the
interview. See *id.,* at 92a–93a.

When he was eventually ready to leave, he had to wait

―――――――――
[1] Fields testified that he left his cell around 8 p.m. and that the in-
terview began around 8:30 p.m. App. to Pet. for Cert. 77a. Both the
Michigan Court of Appeals and the Sixth Circuit stated that the inter-
view began between 7 p.m. and 9 p.m. See *id.,* at 4a, 54a.

[2] The Court of Appeals stated that the interview lasted for approxi-
mately seven hours, see *id.,* at 4a, a figure that appears to be based
on the testimony of one of the interviewing deputies, see *id.,* at 123a.
Fields put the number of hours between five and five and a half, saying
the interview began around 8:30 p.m. and continued until 1:30 a.m. or 2
a.m. See *id.,* at 77a. The Michigan Court of Appeals stated that the
interview ended around midnight, which would put the length of the
interview at between three and five hours.

an additional 20 minutes or so because a corrections of-
ficer had to be summoned to escort him back to his cell,
and he did not return to his cell until well after the hour
when he generally retired.[3]  At no time was Fields given
*Miranda* warnings or advised that he did not have to
speak with the deputies.

The State of Michigan charged Fields with criminal
sexual conduct.  Relying on *Miranda*, Fields moved to
suppress his confession, but the trial court denied his
motion.  Over the renewed objection of defense counsel,
one of the interviewing deputies testified at trial about
Fields' admissions.  The jury convicted Fields of two
counts of third-degree criminal sexual conduct, and the
judge sentenced him to a term of 10 to 15 years of impris-
onment.  On direct appeal, the Michigan Court of Appeals
affirmed, rejecting Fields' contention that his statements
should have been suppressed because he was subjected to
custodial interrogation without a *Miranda* warning.  The
court ruled that Fields had not been in custody for pur-
poses of *Miranda* during the interview, so no *Miranda*
warnings were required.  The court emphasized that
Fields was told that he was free to leave and return to his
cell but that he never asked to do so.  The Michigan Su-
preme Court denied discretionary review.

Fields then filed a petition for a writ of habeas corpus in
Federal District Court, and the court granted relief.  The
Sixth Circuit affirmed, holding that the interview in the
conference room was a "custodial interrogation" within
the meaning of *Miranda* because isolation from the general
prison population combined with questioning about con-
duct occurring outside the prison makes any such interro-
gation custodial *per se*.  The Court of Appeals reasoned
that this Court clearly established in *Mathis* v. *United*

─────────

[3] Fields testified that his normal bedtime was 10:30 p.m. or 11 p.m.
See *id.,* at 78a.

*States*, 391 U. S. 1 (1968), that "*Miranda* warnings must be administered when law enforcement officers remove an inmate from the general prison population and interrogate him regarding criminal conduct that took place outside the jail or prison." 617 F. 3d 813, 820 (CA6 2010); see also *id.,* at 818 ("The central holding of *Mathis* is that a *Miranda* warning is required whenever an incarcerated individual is isolated from the general prison population and interrogated, i.e.[,] questioned in a manner likely to lead to self-incrimination, about conduct occurring outside of the prison"). Because Fields was isolated from the general prison population and interrogated about conduct occurring in the outside world, the Court of Appeals found that the state court's decision was contrary to clearly established federal law as determined by this Court in *Mathis*. 617 F. 3d, at 823.

We granted certiorari. 562 U. S. ___ (2011).

II

Under AEDPA, a federal court may grant a state prisoner's application for a writ of habeas corpus if the state-court adjudication pursuant to which the prisoner is held "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U. S. C. §2254(d)(1). In this context, "clearly established law" signifies "the holdings, as opposed to the dicta, of this Court's decisions." *Williams* v. *Taylor*, 529 U. S. 362, 412 (2000).

In this case, it is abundantly clear that our precedents do not clearly establish the categorical rule on which the Court of Appeals relied, *i.e.,* that the questioning of a prisoner is always custodial when the prisoner is removed from the general prison population and questioned about events that occurred outside the prison. On the contrary, we have repeatedly declined to adopt any categorical rule

with respect to whether the questioning of a prison inmate is custodial.

In *Illinois* v. *Perkins*, 496 U. S. 292 (1990), where we upheld the admission of un-Mirandized statements elicited from an inmate by an undercover officer masquerading as another inmate, we noted that "[t]he bare fact of custody may not in every instance require a warning *even when the suspect is aware that he is speaking to an official, but we do not have occasion to explore that issue here.*" *Id.*, at 299 (emphasis added). Instead, we simply "reject[ed] the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent." *Id.*, at 297.

Most recently, in *Maryland* v. *Shatzer*, 559 U. S. \_\_\_ (2010), we expressly declined to adopt a bright-line rule for determining the applicability of *Miranda* in prisons. *Shatzer* considered whether a break in custody ends the presumption of involuntariness established in *Edwards* v. *Arizona*, 451 U. S. 477 (1981), and, if so, whether a prisoner's return to the general prison population after a custodial interrogation constitutes a break in *Miranda* custody. See 559 U. S., at \_\_\_ (slip op., at 3–4). In considering the latter question, we noted first that "[w]e have *never* decided whether incarceration constitutes custody for *Miranda* purposes, and have indeed explicitly declined to address the issue." *Id.*, at \_\_\_ (slip op., at 13) (citing *Perkins*, *supra,* at 299; emphasis added). The answer to this question, we noted, would "depen[d] upon whether [incarceration] exerts the coercive pressure that *Miranda* was designed to guard against—the 'danger of coercion [that] results from the *interaction* of custody and official interrogation.'" 559 U. S., at \_\_\_ (slip op., at 13) (quoting *Perkins*, *supra,* at 297).

In concluding that our precedents establish a categorical rule, the Court of Appeals placed great weight on the

decision in *Mathis*, but the Court of Appeals misread the
holding in that case. In *Mathis*, an inmate in a state
prison was questioned by an Internal Revenue agent and
was subsequently convicted for federal offenses. The
Court of Appeals held that *Miranda* did not apply to this
interview for two reasons: A criminal investigation had
not been commenced at the time of the interview, and
the prisoner was incarcerated for an "unconnected offense."
*Mathis* v. *United States*, 376 F. 2d 595, 597 (CA5 1967).
This Court rejected both of those grounds for distinguish-
ing *Miranda,* 391 U. S., at 4, and thus the holding in
*Mathis* is simply that a prisoner who otherwise meets the
requirements for *Miranda* custody is not taken outside the
scope of *Miranda* by either of the two factors on which
the Court of Appeals had relied. *Mathis* did not hold
that imprisonment, in and of itself, is enough to constitute
*Miranda* custody.[4] Nor, contrary to respondent's submis-
sion, see Brief for Respondent 14, did *Oregon* v. *Mathia-
son*, 429 U. S. 492, 494 (1977) *(per curiam)*, which simply
restated in dictum the holding in *Mathis*.

The Court of Appeals purported to find support for its
*per se* rule in *Shatzer*, relying on our statement that "[n]o
one questions that Shatzer was in custody for *Miranda*
purposes" when he was interviewed. 559 U. S., at ___ (slip
op., at 13). But this statement means only that the issue
of custody was not contested before us. It strains credulity
to read the statement as constituting an "unambiguous
conclusion" or "finding" by this Court that Shatzer was in
custody. 617 F. 3d, at 822.

Finally, contrary to respondent's suggestion, see Brief
for Respondent 12–15, *Miranda* itself did not clearly es-

———————

[4] Indeed, it is impossible to tell from either the opinion of this Court
or that of the court below whether the prisoner's interview was routine
or whether there were special features that may have created an
especially coercive atmosphere.

tablish the rule applied by the Court of Appeals. *Miranda* adopted a "set of prophylactic measures" designed to ward off the "'inherently compelling pressures' of custodial interrogation," *Shatzer, supra,* at \_\_\_ (slip op., at 4) (quoting *Miranda,* 384 U. S., at 467), but *Miranda* did not hold that such pressures are always present when a prisoner is taken aside and questioned about events outside the prison walls. Indeed, *Miranda* did not even establish that police questioning of a suspect at the station house is always custodial. See *Mathiason, supra,* at 495 (declining to find that *Miranda* warnings are required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect").

In sum, our decisions do not clearly establish that a prisoner is always in custody for purposes of *Miranda* whenever a prisoner is isolated from the general prison population and questioned about conduct outside the prison.[5]

––––––––––

[5] The state-court decision applied the traditional context-specific analysis to determine whether the circumstances of respondent's interrogation gave rise to "the coercive pressure that *Miranda* was designed to guard against." *Shatzer,* 559 U. S., at \_\_\_ (slip op., at 13). The court first observed: "That a defendant is in prison for an unrelated offense when being questioned does not, *without more,* mean that he was in custody for the purpose of determining whether *Miranda* warnings were required." App. to Pet. for Cert. 56a (internal quotation marks omitted and emphasis added). In this case, the court noted, the "defendant was unquestionably in custody, but on a matter unrelated to the interrogation." *Ibid.* The Sixth Circuit concluded that the state court thereby limited *Miranda* in a way rejected by *Mathis* v. *United States*, 391 U. S. 1 (1968), and "curtail[ed] the warnings to be given persons under interrogation by officers based on the reason why the person is in custody." *Id.,* at 4–5. We think the better reading is that the state court merely meant to draw a distinction between incarceration and *Miranda* custody. This reading is supported by the state court's subsequent consideration of whether the facts of the case were likely to create an atmosphere of coercion. App. to Pet. for Cert. 56a.

### III

Not only does the categorical rule applied below go well beyond anything that is clearly established in our prior decisions, it is simply wrong. The three elements of that rule—(1) imprisonment, (2) questioning in private, and (3) questioning about events in the outside world—are not necessarily enough to create a custodial situation for *Miranda* purposes.

### A

As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," *Stansbury* v. *California,* 511 U. S. 318, 322–323, 325 (1994) *(per curiam),* a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson* v. *Keohane*, 516 U. S. 99, 112 (1995). And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." *Stansbury*, *supra,* at 322, 325 (internal quotation marks omitted). Relevant factors include the location of the questioning, see *Shatzer*, *supra,* at ___–___ (slip op., at 13–16), its duration, see *Berkemer* v. *McCarty*, 468 U. S. 420, 437–438 (1984), statements made during the interview, see *Mathiason*, *supra,* at 495; *Yarborough* v. *Alvarado*, 541 U. S. 652, 665 (2004); *Stansbury*, *supra,* at 325, the presence or absence of physical restraints during the questioning, see *New York* v. *Quarles*, 467 U. S. 649, 655 (1984), and the release of the interviewee at the end of the questioning, see *California* v. *Beheler*, 463 U. S. 1121, 1122–1123 (1983) *(per curiam).*

Determining whether an individual's freedom of move-

ment was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda.* We have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry, *Berkemer*, *supra,* at 437, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda.* "Our cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Shatzer*, 559 U. S., at ___ (slip op., at 14).

This important point is illustrated by our decision in *Berkemer* v. *McCarty*, *supra.* In that case, we held that the roadside questioning of a motorist who was pulled over in a routine traffic stop did not constitute custodial inter-rogation. *Id.,* at 423, 441–442. We acknowledged that "a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers," and that it is generally "a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permis-sion." *Id.*, at 436. "[F]ew motorists," we noted, "would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." *Ibid.* Nevertheless, we held that a person detained as a result of a traffic stop is not in *Miranda* custody because such detention does not "sufficiently impair [the detained person's] free exercise of his privilege against self-incrimination to require that he be warned of his consti-tutional rights." 468 U. S., at 437. As we later put it, the "temporary and relatively nonthreatening detention in-volved in a traffic stop or *Terry* stop does not constitute *Miranda* custody," *Shatzer*, *supra,* at ___ (slip op., at 14) (citation omitted). See *Terry* v. *Ohio*, 392 U. S. 1 (1968).

It may be thought that the situation in *Berkemer*—the questioning of a motorist subjected to a brief traffic stop—

is worlds away from those present when an inmate is questioned in a prison, but the same cannot be said of *Shatz*er, where we again distinguished between restraints on freedom of movement and *Miranda* custody. *Shatzer,* as noted*,* concerned the *Edwards* prophylactic rule, which limits the ability of the police to initiate further questioning of a suspect in *Miranda* custody once the suspect invokes the right to counsel. We held in *Shatzer* that this rule does not apply when there is a sufficient break in custody between the suspect's invocation of the right to counsel and the initiation of subsequent questioning. See 559 U. S., at ___ (slip op., at 13-16). And, what is significant for present purposes, we further held that a break in custody may occur while a suspect is serving a term in prison. If a break in custody can occur while a prisoner is serving an uninterrupted term of imprisonment, it must follow that imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda.*

There are at least three strong grounds for this conclusion. First, questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest. In the paradigmatic *Miranda* situation—a person is arrested in his home or on the street and whisked to a police station for questioning—detention represents a sharp and ominous change, and the shock may give rise to coercive pressures. A person who is "cut off from his normal life and companions," *Shatzer*, *supra,* at ___ (slip op., at 7), and abruptly transported from the street into a "police-dominated atmosphere," *Miranda*, 384 U. S., at 456, may feel coerced into answering questions.

By contrast, when a person who is already serving a term of imprisonment is questioned, there is usually no such change. "Interrogated suspects who have previously been convicted of crime live in prison." *Shatzer,* 559 U. S., at ___ (slip op., at 14). For a person serving a term of

incarceration, we reasoned in *Shatzer*, the ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar and thus do not involve the same "inherently compelling pressures" that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station. *Id.,* at \_\_\_ (slip op., at 4).

Second, a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release. When a person is arrested and taken to a station house for interrogation, the person who is questioned may be pressured to speak by the hope that, after doing so, he will be allowed to leave and go home. On the other hand, when a prisoner is questioned, he knows that when the questioning ceases, he will remain under confinement. *Id.,* at \_\_\_–\_\_\_, n. 8 (slip op., at 14–15, n. 8).

Third, a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence. *Id.,* at \_\_\_–\_\_\_ (slip op., at 14–15). And "where the possibility of parole exists," the interrogating officers probably also lack the power to bring about an early release. *Ibid.* "When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners." *Perkins*, 496 U. S., at 297. Under such circumstances, there is little "basis for the assumption that a suspect . . . will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of [a] more lenient treatment should he confess." *Id.*, at 296–297.

In short, standard conditions of confinement and associated restrictions on freedom will not necessarily implicate the same interests that the Court sought to protect when it afforded special safeguards to persons subjected to

custodial interrogation. Thus, service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody.

B

The two other elements included in the Court of Appeals' rule—questioning in private and questioning about events that took place outside the prison—are likewise insufficient.

Taking a prisoner aside for questioning—as opposed to questioning the prisoner in the presence of fellow inmates—does not necessarily convert a "noncustodial situation . . . to one in which *Miranda* applies." *Mathiason*, 429 U. S., at 495. When a person who is not serving a prison term is questioned, isolation may contribute to a coercive atmosphere by preventing family members, friends, and others who may be sympathetic from providing either advice or emotional support. And without any such assistance, the person who is questioned may feel overwhelming pressure to speak and to refrain from asking that the interview be terminated.

By contrast, questioning a prisoner in private does not generally remove the prisoner from a supportive atmosphere. Fellow inmates are by no means necessarily friends. On the contrary, they may be hostile and, for a variety of reasons, may react negatively to what the questioning reveals. In the present case, for example, would respondent have felt more at ease if he had been questioned in the presence of other inmates about the sexual abuse of an adolescent boy? Isolation from the general prison population is often in the best interest of the interviewee and, in any event, does not suggest on its own the atmosphere of coercion that concerned the Court in *Miranda*.

It is true that taking a prisoner aside for questioning may necessitate some additional limitations on his free-

dom of movement. A prisoner may, for example, be removed from an exercise yard and taken, under close guard, to the room where the interview is to be held. But such procedures are an ordinary and familiar attribute of life behind bars. Escorts and special security precautions may be standard procedures regardless of the purpose for which an inmate is removed from his regular routine and taken to a special location. For example, ordinary prison procedure may require such measures when a prisoner is led to a meeting with an attorney.

Finally, we fail to see why questioning about criminal activity outside the prison should be regarded as having a significantly greater potential for coercion than questioning under otherwise identical circumstances about criminal activity within the prison walls. In both instances, there is the potential for additional criminal liability and punishment. If anything, the distinction would seem to cut the other way, as an inmate who confesses to misconduct that occurred within the prison may also incur administrative penalties, but even this is not enough to tip the scale in the direction of custody. "The threat to a citizen's Fifth Amendment rights that *Miranda* was designed to neutralize" is neither mitigated nor magnified by the location of the conduct about which questions are asked. *Berkemer,* 468 U. S., at 435, n. 22.

For these reasons, the Court of Appeals' categorical rule is unsound.

## IV

### A

When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted. See *Yarborough*, 541 U. S., at 665. An inmate who is removed from the general prison

population for questioning and is "thereafter . . . subjected to treatment" in connection with the interrogation "that renders him 'in custody' for practical purposes . . . will be entitled to the full panoply of protections prescribed by *Miranda*." *Berkemer*, 468 U. S., at 440.

"Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Id.,* at 437; see *Shatzer*, 559 U. S., at ___ (slip op., at 9); *Mathiason*, *supra,* at 495. Confessions voluntarily made by prisoners in other situations should not be suppressed. "Voluntary confessions are not merely a proper element in law enforcement, they are an unmitigated good, essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Shatzer*, *supra,* at ___ (slip op., at 9) (internal quotation marks and citations omitted).

## B

The record in this case reveals that respondent was not taken into custody for purposes of *Miranda.* To be sure, respondent did not invite the interview or consent to it in advance, and he was not advised that he was free to decline to speak with the deputies. The following facts also lend some support to respondent's argument that *Miranda*'s custody requirement was met: The interview lasted for between five and seven hours in the evening and continued well past the hour when respondent generally went to bed; the deputies who questioned respondent were armed; and one of the deputies, according to respondent, "[u]sed a very sharp tone," App. to Pet. for Cert. 76a, and, on one occasion, profanity, see *id.,* at 77a.

These circumstances, however, were offset by others. Most important, respondent was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted.

See *id.,* at 89a–90a ("I was told I could get up and leave whenever I wanted"); *id.*, at 70a–71a. Moreover, respondent was not physically restrained or threatened and was interviewed in a well-lit, average-sized conference room, where he was "not uncomfortable." *Id.,* at 90a; see *id.*, at 71a, 88a–89a. He was offered food and water, and the door to the conference room was sometimes left open. See *id.,* at 70a, 74a. "All of these objective facts are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." *Yarborough, supra,* at 664–665.

Because he was in prison, respondent was not free to leave the conference room by himself and to make his own way through the facility to his cell. Instead, he was escorted to the conference room and, when he ultimately decided to end the interview, he had to wait about 20 minutes for a corrections officer to arrive and escort him to his cell. But he would have been subject to this same restraint even if he had been taken to the conference room for some reason other than police questioning; under no circumstances could he have reasonably expected to be able to roam free.[6] And while respondent testified that he

———————

[6] Respondent did not testify to the contrary. The following colloquy occurred at his *Miranda* hearing:

"Q. You're not generally allowed to just roam around Lenawee County Jail on your own, are you?

"A. No, I never have.

"Q. So wouldn't it make sense to you, since you had that experience, that in fact you would have been escorted just like you were escorted . . . into this conference room?

"A. That makes common sense.

"Q. So when they said that you were free to leave and you get up— could get up and go and all you had to do was tell them you wanted to go, in your mind, did you understand that to mean that somebody would come get you and take you back to your cell?

"A. But that doesn't give me freedom to just get up and walk away.

"Q. I understand it doesn't—

"A. So, no.

"was told . . . if I did not want to cooperate, I needed to go
back to my cell," these words did not coerce cooperation by
threatening harsher conditions. App. to Pet. for Cert. 71a;
see *id.*, at 89a ("I was told, if I didn't want to cooperate,
I could leave"). Returning to his cell would merely have
returned him to his usual environment. See *Shatzer*,
*supra*, at ___ (slip op., at 14) ("Interrogated suspects who
have previously been convicted of crime live in prison.
When they are released back into the general prison popu-
lation, they return to their accustomed surroundings and
daily routine—they regain the degree of control they had
over their lives prior to the interrogation").

   Taking into account all of the circumstances of the
questioning—including especially the undisputed fact that
respondent was told that he was free to end the question-
ing and to return to his cell—we hold that respondent was
not in custody within the meaning of *Miranda*.

*       *       *

   The judgment of the Court of Appeals is

*Reversed.*

---

"Q. The question is this, sir, not whether you had freedom to get up
and walk away, but did you understand that what that meant was that
a jailer would come get you and—
"A. No—
"Q. —take you back to your cell?
"A. I did not understand that.
"Q. You didn't?
"A. No.
"Q. Why not? That's how you got there.
"A. Because I did not know if a jailer would take me back or if one of
those gentlemen would take me back.
"Q. But you understood that, if you asked, one of them or a jailer would
take you back to your cell?
"A. I assumed that.
"Q. And you believed that to be true?
"A. I assumed that." App. to Pet. for Cert. 91a–92a.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–680

_____

## CAROL HOWES, WARDEN, PETITIONER *v.* RANDALL LEE FIELDS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[February 21, 2012]

JUSTICE GINSBURG, with whom JUSTICE BREYER and JUSTICE SOTOMAYOR join, concurring in part and dissenting in part.

Given this Court's controlling decisions on what counts as "custody" for *Miranda* purposes, I agree that the law is not "clearly established" in respondent Fields's favor. See, *e.g., Maryland* v. *Shatzer*, 559 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 13–16); *Thompson* v. *Keohane*, 516 U. S. 99, 112 (1995). But I disagree with the Court's further determination that Fields was not in custody under *Miranda.* Were the case here on direct review, I would vote to hold that *Miranda* precludes the State's introduction of Fields's confession as evidence against him.

*Miranda* v. *Arizona*, 384 U. S. 436 (1966), reacted to police interrogation tactics that eroded the Fifth Amendment's ban on compulsory self-incrimination. The opinion did so by requiring interrogators to convey to suspects the now-familiar warnings: The suspect is to be informed, prior to interrogation, that he "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*, at 444.

Under what circumstances are *Miranda* warnings required? *Miranda* tells us "in all settings in which [a per-

son's] freedom of action is curtailed in any significant
way." *Id.*, at 467. Given the reality that police interroga-
tors "trad[e] on the weakness of individuals," *i.e.*, their
"insecurity about [themselves] or [their] surroundings,"
*id.*, at 455, the Court found the preinterrogation warnings
set out in the opinion "indispensable," *id.*, at 469. Those
warnings, the Court elaborated, are "an absolute prerequi-
site in overcoming the inherent pressures of the interroga-
tion atmosphere," *id.*, at 468; they "insure" that the sus-
pect is timely told of his Fifth Amendment privilege, and
his freedom to exercise it, *id.*, at 469.

Fields, serving time for disorderly conduct, was, of
course, "i[n] custody," but not "for purposes of *Miranda*,"
the Court concludes. *Ante*, at 14. I would not train, as the
Court does, on the question whether there can be custody
within custody. Instead, I would ask, as *Miranda* put it,
whether Fields was subjected to "incommunicado interro-
gation . . . in a police-dominated atmosphere," 384 U. S., at
445, whether he was placed, against his will, in an inher-
ently stressful situation, see *id.*, at 468, and whether his
"freedom of action [was] curtailed in any significant way,"
*id.*, at 467. Those should be the key questions, and to each
I would answer "Yes."

As the Court acknowledges, Fields did not invite or
consent to the interview. *Ante*, at 14. He was removed
from his cell in the evening, taken to a conference room in
the sheriff's quarters, and questioned by two armed depu-
ties long into the night and early morning. *Ibid.* He was
not told at the outset that he had the right to decline to
speak with the deputies. *Ibid.* Shut in with the armed
officers, Fields felt "trapped." App. to Pet. for Cert. 71a.
Although told he could return to his cell if he did not want
to cooperate, *id.*, at 71a–72a, Fields believed the deputies
"would not have allowed [him] to leave the room," *id.*, at
72a. And with good reason. More than once, "he told the
officers . . . he did not want to speak with them anymore."

617 F. 3d 813, 815 (CA6 2010). He was given water, App. to Pet. for Cert. 74a, but not his evening medications, *id.*, at 79a.* Yet the Court concludes that Fields was in "an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." *Ante*, at 15 (quoting *Yarborough* v. *Alvarado*, 541 U. S. 652, 665 (2004)).

Critical to the Court's judgment is "the undisputed fact that [Fields] was told that he was free to end the questioning and to return to his cell." *Ante*, at 17. Never mind the facts suggesting that Fields's submission to the overnight interview was anything but voluntary. Was Fields "held for interrogation"? See *Miranda*, 384 U. S., at 471. Brought to, and left alone with, the gun-bearing deputies, he surely was in my judgment.

*Miranda* instructed that such a person "must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." *Ibid.* Those warnings, along with "warnings of the right to remain silent and that anything stated can be used in evidence against [the speaker]," *Miranda* explained, are necessary "prerequisite[s] to [an] interrogation" compatible with the Fifth Amendment. *Ibid.* Today, for people already in prison, the Court finds it adequate for the police to say: "You are free to terminate this interrogation and return to your cell." Such a statement is no substitute for one ensuring that an individual is aware of his rights.

For the reasons stated, I would hold that the "incommunicado interrogation [of Fields] in a police-dominated atmosphere," *id.*, at 445, without informing him of his rights, dishonored the Fifth Amendment privilege *Miranda* was designed to safeguard.

―――――――――

*Each night, Fields took an antidepressant and, due to his kidney transplant surgery, two antirejection medications. App. to Pet. for Cert. 79a.