W. FLETCHER, Circuit Judge,
dissenting from the denial of rehearing en banc:
In this ease, a 16-year-old high school student named Jovan’z Smith was taken to a police station and subjected to four hours of interrogation in a small, windowless room. Smith was not read his Miranda rights. Four hours later, still without his Miranda warnings, he confessed. The only question before this court is whether Smith was “in custody” under Miranda when he confessed.
The California Court of Appeal concluded that Smith was not “in custody.” It relied exclusively on the “fact” that, in the words of the court, he “was told three times that he was'not under arrest and was free to go.” See People v. Smith, No. A125912, 2010 WL 4233298, at *3 (Cal.Ct. App. Oct. 27, 2010) (unpublished). In an unpublished disposition, a three-judge panel of this court denied his petition for a writ of habeas corpus, concluding that the Court of Appeal’s opinion, while suspect, was neither “contrary to,” nor involved “an unreasonable application of, clearly established Federal law.” 28 U.S.C. § 2254(d)(1). Smith v. Clark, 612 Fed.Appx. 418, 419 (9th Cir.2015).
I disagree. Smith was clearly “in custody” under Miranda. The California Court of Appeal’s conclusion to the contrary rested on a misreading of California v. Behel *984 er, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam). In the Court of Appeal’s reading, Beheler establishes a bright-line rule that a suspect who has been told repeatedly that he is “not under arrest” is not “in custody” under Miranda. But this is not the law. A police officer cannot remove an interrogation from Miranda’s reach simply by reciting magic words. We should have corrected the Court of Appeal’s error. Smith’s conviction, and many others, hang in the balance.
I respectfully dissent from our decision not to rehear this case en banc.
I. Background
A. Smith
Jovan’z Smith was 16 years old when he was taken from his classroom and brought to the Vallejo Police Department for questioning. Over the next four hours, he was interrogated in a small windowless room by a team of three police officers about the choking death of his daughter. The officers took his cell phone and did not return it; they evaded his questions about whether he was free to leave, at one point clearly implying that he could not leave as long as officers still had questions; they arranged for his daughter’s maternal grandmother to come to the station to question and berate him; they administered a lie detector test, which they told him he failed; after the lie detector test, they repeatedly told him that he was lying; they then told him, “You can’t leave this room lying.” Smith confessed only after he had been told that he could not leave the room lying. After he confessed, the officers read him his Miranda rights. Smith then repeated the confession he had just given.
The California Court of Appeal’s decision that Smith was not in “custody” for the purposes of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), turned on the “fact” that Smith, according to the Court of Appeal, “was told three times that he was not under arrest and was free to go.” Smith, 2010 WL 4233298, at *3. This misstates the record: Smith was told only once, at the beginning of the interrogation, that he was “free to go.”
Smith was, however, told three times that he was “not under arrest.” The first time was at Smith’s high school, when a uniformed Vallejo police officer told him'he. was “not under arrest” but that an investigator wanted to speak to him. Smith agreed to accompany the officer to the Vallejo Police Department. They drove to the police station in a patrol car, with the officer in the front and Smith in the back. According to the officer, they had a “friendly conversation” on the way to the station. Once at the station, the officer placed Smith in an interview room. It was roughly 2:30 PM.
The second time was in the interview room, at the beginning of Smith’s interrogation, when Detective Sharon .Fong entered the room, introduced herself, and told Smith he was “not under arrest” and was “free to leave at any time.” It was roughly 2:33 PM.
Fong and Smith spoke for about twenty minutes, during about what happened to his 18-month-old daughter, T. Smith told Fong he had accidentally left baby wipes on T.’s bed. He said that he turned away, and when he turned back, T. was “turning purple” and “throwing up blood.” He said that the doctors later told him that T. had swallowed a baby wipe.
Around 2:55 PM, a second police officer, Detective Eric Mustard, entered the interview room. Over the next half hour, Mustard asked increasingly hostile questions. He asked Smith how many children he had. He asked Smith how many girl *985 friends he had. He told Smith, “Honesty is a huge issue right here----So be real honest with me.” He expressed skepticism that T. would have swallowed the baby wipes, and noted that “we will figure that out ... forensically.” He said, “[S]ometimes we get caught up in the moment and we do something that we regret and we feel bad for.” He suggested that Smith confess, and told Smith that if he did not, and it later came out that he had lied, “people are gonna look at you and judge you as a cold-hearted son-of-a-biteh.” When Mustard left the room, he took Smith’s cell phone.
Around 4:10 PM, Mustard returned with T.’s maternal grandmother, N.N. began to cry almost immediately. Mustard told Smith, ‘You can look at me and you can tell me whatever story you want to tell me, [but] that’s blood to that lady.” He told Smith again that he did not believe his story:
I told you this earlier and I tell you again, you gotta do the right thing, man, ’cause if you want to be a good person, if you want people to think you’re a good person, if something bad happened, an accident happened and this wasn’t something that’s cold ... A lotta things runnin’ through your mind right now, I know that. I told you if the truth comes out today I can help you. If it comes out tomorrow or the next day or next week I can’t help you. Today, the truth.
He asked: “Can you look that lady in the eye and tell her you didn’t do that?” N. then told Smith that her granddaughter, T., was brain-dead.
Around 4:50 PM, after N. and Mustard had left, Detective Frank Pucci arrived to conduct a lie detector test. As Pucci set up the test, Smith asked, “After this, will I be able to go home?” Pucci responded, ‘You know what, what I don’t know is, are you and Detective Mustard done talking?” Smith replied, “I don’t know.” Pucci said, “Okay, um, yeah. You understand you’re not under arrest, okay? We’re just trying to gather all the facts.” Pucci ended the exchange by saying, “So there may be some questions with Detective Mustard, I don’t know. Alright?” This was the third and final time Smith was told that he was “not under arrest.” It was roughly 4:55 PM.
The interrogation continued for another hour and- a half. During the lie detector test, Pucci asked Smith whether he had put the baby wipe in T’s mouth. Smith said that he had not. After the test, Pucci left the interview room. When Pucci returned with Mustard, he told Smith that he had failed the test. The officers told Smith to “be honest,” and not to “lie to [him]self.” Smith changed his story somewhat, stating that he had seen T. choking on the baby wipe and had reached in to take it out. He .maintained, however, that he had not intentionally hurt her.
The officers insisted that Smith was lying. Pucci asked, “Jovan’z, it didn’t happen like that, did it?” Smith said it had. Pucci said, “I hear what you’re saying. But it didn’t happen like that.” Smith repeatedly insisted that it had, reiterating that he had gotten up to change the channel on the television and had turned around to find T. choking. Finally, Pucci told him: “Don’t lie, man. You can’t leave this room lying, bro.” It was 6:10 PM.
Twenty minutes later, after he had been told “you can’t leave this room lying,” Smith confessed. He told his interrogators that he had pushed the baby wipes into T.’s mouth in a moment of anger. Mustard suggested that they take a break, and that Smith “write that little girl a letter” and tell her that he was sorry. Shortly thereafter, the officers brought Smith a slice of pizza, the first food he had *986 been given since he arrived at the station. Around 8:30 PM, in a different room in the station, the officers finally read Smith his Miranda warnings. In response to questions, Smith repeated the confession he had given earlier. It had been six hours since he was first brought to the police station.
Smith was prosecuted for murder and assault of a 'child causing death. He moved to suppress his statements as obtained in violation of Miranda, but the motion was denied. The jury watched a tape of his pre-Miranda interrogation. The jury hung on the murder charge but convicted him of the assault charge, and Smith was sentenced to 25 years to life in state prison.
B. Beheler
What happened to Smith in the police station is not documented, police officers in California are specifically instructed to inform suspects that they are “not under arrest” in order to “ma[k]e certain that the interrogation w[ill] be seen as non-custodial.” Charles D. Weisselberg, Mourning Miranda, 96 Cal. L.Rev. 1519, 1542^4 (2008). This is known as a “Beheler admonishment,” after California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam). The defendant in Beheler, who gave an inculpatory statement to the police, had been “specifically told that he was not under arrest.” Id. at 1122, 103 S.Ct. 3517. The California police academies have interpreted Beheler to mean that, if a police officer says the magic words, telling a suspect that he is “not under arrest,” the suspect will not be found to have been in “custody” under Miranda.
Beheler admonishments play a major role in instructional material produced by the California Commission on Peace Officer Standards and Training (“POST”). As Weisselberg documents, one set of POST training materials describe Beheler as “a wonderful case for use.” Weisselberg, supra, at 1542. Another POST course dramatizes the use of Beheler admonishments on a suspect in connection with “the full toolkit of interrogation tactics,” including confrontation and minimization techniques (the use of sympathy and justifications to induce a confession). Id. at 1544. The same POST course features a debate between experts on whether, if a suspect attempts to exercise his right to leave the interview, the police should allow him to do so. Id.
The use of Beheler admonishments is not limited to California. Cases from the federal courts, and over 31 state courts, demonstrate the use of similar tactics nationwide. Id. at 1545 nn. 14CM1; see, e.g., United States v. McCarty, 475 F.3d 39, 46 (1st Cir.2007); United States v. LeBrun, 363 F.3d 715, 718 (8th Cir.2004); Fitzpatrick v. State, 900 So.2d 495, 510 (Fla. 2005); State v. Munoz, 126 N.M. 535, 972 P.2d 847, 856 (1998); State v. Hobson, 648 A.2d 1369, 1370-72 (R.I.1994); State v. Bronson, 242 Neb. 931, 496 N.W.2d 882, 889 (1993). An FBI publication from the 1980s similarly instructs federal agents to inform suspects that they are not under arrest, “thus negating the need for the [Miranda ] warning.” See Charles E. Riley III, Finetuning Miranda Policies, FBI Law Enforcement Bull. 23, 24-25 (1985); see also Weisselberg, supra, at 1546 nn. 145-46.
As Weisselberg notes, the use of Beheler admonishments is clearly strategic in nature. Beheler admonishments help police officers (falsely) convey to suspects that they are not under suspicion, thereby enhancing the effectiveness of “soft” tactics, such as minimization, that induce confessions. But they also have an even more powerful effect. As interpreted by the *987 police and California state courts, they serve as virtually conclusive evidence that a suspect was not in “custody” during an interrogation, and therefore that no Miranda warnings were required. In other words, they permit police officers to remove confessions from Miranda’s, reach.
Sometimes, it will not be possible to determine whether police officers used Be-heler admonishments strategically. In this case, however, it is easy. At 3 PM, Detective Mustard entered the interview room to take over Smith’s interrogation. Before he asked Smith any questions, however, Mustard turned to Detective Fong and asked, “Are you Beheler-ing here?”. Fong answered, “Yes.”
C. Smith
Smith appealed his conviction to the California Court of have been suppressed because it was obtained in violation of Miranda because he had been in custody when he first confessed. The Court of Appeal denied his claim. It held that “the trial court’s ruling was well supported.” Smith, 2010 WL 4233298, at *3. It explained:
The record here indicates that appellant was told three times that he was not under arrest and that he was free to go. The first occurred when appellant was at school. Officer Barrientos told appellant he was not under arrest and he asked appellant whether he was willing to answer some questions at the police station. The second time occurred when Detective Fong began interviewing appellant at the police station. Fong told appellant that he was not under arrest and that he was free to terminate the interview and leave at any time. The third time occurred when Detective Puc-ci came into the interview room to give appellant a voice stress test. Appellant asked Pucci whether he could leave after the test. Pucci said he did not know, but he then went on to tell appellant yet again that he was not under arrest. We think a reasonable person who is told repeatedly that he is not under arrest and that he is free to go would understand that he is not under arrest and that he is free to go. We conclude the trial court ruled correctly.
Id. (emphasis added).
On federal habeas review, the magistrate judge concluded Smith’s was a “close case.” Smith v. Clark, No. 2:11-CV-3312, 2013 WL 4409717, at *1 (E.D.Cal. Aug. 15, 2013). It concluded that if Smith’s age were taken into consideration, as required by J.D.B. v. North Carolina, 564 U.S. 261, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011), the state court’s conclusion that Smith was not “in custody” would be “unreasonable” under 28 U.S.C. § 2254(d) and Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). Id. at *1. Because J.D.B. postdated the Court of Appeal’s decision, however, the magistrate judge concluded that the Court of Appeal did not err in not factoring Smith’s age into its analysis, and that, absent consideration of Smith’s age, the court’s decision was not “unreasonable” under § 2254(d). Id. at *26. The district court approved the magistrate judge’s recommendation that habe-as be denied, but it certified for appeal the question whether the interrogation was custodial.
A three-judge panel affirmed the denial of Smith’s petition, relying in large part on the rationale of the magistrate judge. See Smith, 612 Fed.Appx. at 420-21. Judge Watford concurred. See id. at 421-24 (Watford, J., concurring). He wrote that he found the denial of Smith’s motion to suppress “troubling.” Id. at 421-22. Despite his “misgivings,” however, Judge Watford felt “compelled to affirm under AEDPA.” Id. at 424.
*988 II. Discussion
As this case illustrates, the California courts — and the California police academies — have misread Beheler. They interpret it as creating a bright-line rule that a suspect who has been told repeatedly that he is “not under arrest” is not “in custody” under Miranda. But Beheler does not stand for such a rule, nor could it. It has never been the law that a police officer can insulate an otherwise clearly custodial interrogation from Miranda’s reach simply by telling a suspect that he or she is “not under arrest.” Because Smith’s conviction rests on the Court of Appeal’s erroneous understanding of what it means to be “in custody” under Miranda, we should have granted his petition for a writ of habeas corpus.
Under AEDPA, we may grant a petition for a writ of habeas corpus only if the state court judgment was “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.” See 28 U.S.C. § 2254(d)(1). We “look to the last reasoned state court adjudication on the merits of [Smith’s] Miranda claim, which was the decision of the California Court of Appeal.” Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir.2013). There is no question that the Court of Appeal’s judgment was “contrary to” the law set forth by the Supreme Court in a long line of cases ranging from Howes v. Fields, — U.S.-, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012), to Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004), to Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), to Beheler itself.
Miranda holds that certain warnings are required in the context of custodial interrogations given “the compulsion inherent in custodial surroundings.” See 384 U.S. at 458, 86 S.Ct. 1602. The word “custody” is a “term of art that specifies circumstances that are thought generally to present a serious danger of coercion.” Howes, 132 S.Ct. at 1189. In determining whether a person is in “custody” for purposes of Miranda, the Supreme Court has held that “[t]wo discrete inquiries are essential: first, what are the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.” Thompson, 516 U.S. at 112, 116 S.Ct. 457. The “ultimate inquiry” is whether there was “a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.” Id. If there is, Miranda warnings are required.
The Supreme Court has repeatedly instructed courts to “examine ‘all of the circumstances surrounding the interrogation.’” Fields, 132 S.Ct. at 1189 (quoting Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam)). Relevant factors include
the location of the questioning, see Maryland v. Shatzer, [559 U.S. 98,] 130 S.Ct. [1213,] 1223-26 [175 L.Ed.2d 1045 (2010) ], its duration, see Berkemer v. McCarty, 468 U.S. 420, 437-38, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), statements made during the interview, see Oregon v. Mathiason, [429 U.S. 492,] 495, 97 S.Ct. 711 [50 L.Ed.2d 714 (1977)] (per curiam); Alvarado, 541 U.S. at 665, 124 S.Ct. 2140; Stansbury, [511 U.S.] at 325, 114 S.Ct. 1526, the presence or absence of physical restraints during the questioning, see New York v. Quarles, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), and the release of the interviewee at the end of the questioning, see Beheler, 463 U.S. at 1122-23, 103 S.Ct. 3517.
*989 Fields, 132 S.Ct. at 1189 (citations altered); see also United States v. Kim, 292 F.3d 969, 974 (9th Cir.2002).
In this case, virtually all of these factors lead to a conclusion that Smith was in “custody” under Miranda. Smith was interrogated for four hours (and held for nearly six) before he was read Miranda warnings. He was interrogated in a small windowless room in “the bowels” of the police station. His cell phone was taken from him and not returned. Although the interrogating officers were friendly at first, they quickly became hostile. Within an hour they had all but stated that they suspected him of T.’s death. Smith finally agreed to take a lie detector test, which the officers told him that he had failed. When he continued to maintain his innocence, the officers told him flatly that they did not believe him: “Jovan’z, it didn’t happen like that,” said one. “You can’t leave this room lying, bro,” said the other. No reasonable person in these circumstances — whether a sixteen-year-old or a mature adult — would think that he was free to leave until he told a story that the officers believed.
The Court of Appeal’s contrary conclusion rested entirely on the “fact” that, in its words, Smith “was told three times that he was not under arrest and that he was free to go.” As a preliminary matter, this misstates the record: Smith was not told three times that he was “free to go.” He was told only once, before questioning began, that he was free to go. Instead, he was told three times that he was “not under arrest.” A lay person understands that the statement “you’re free to go” means precisely that, but a lay person does. not necessarily understand that the statement “you’re not under arrest” means “you’re free to terminate the interrogation and leave.”
Further, the officers’ three statements that Smith was “not under arrest” would not lead a reasonable person to feel that he was free to terminate the interrogation under the circumstances here. The first two admonishments came early, once at the high school and then before the interrogation had begun. And the third admonishment could hardly have put Smith on notice that he was free to leave once the interrogation had begun. The third admonishment was given when Smith asked Detective Pucci whether he could go home after taking the lie detector test. Judge Watford, concurring separately in the panel disposition, put it well:
The officer didn’t respond with the only answer consistent with Smith’s supposed freedom to leave, which would have been “yes, of course.” Instead, he told Smith, “Hey, you know, I don’t know. Are you and Detective Mustard done talking?” That response seems pretty clearly to indicate that Smith wasn’t free to leave whenever he chose but rather only when Detective Mustard had finished interrogating him. That the officer hastily added, “You understand you’re not under arrest, okay?” doesn’t seem to change anything.
Smith, 612 Fed.Appx. at 423 (Watford, J., concurring).
Thus, even if I thought the Court of Appeal had applied the correct standard— and I do not — I would conclude it had unreasonably applied it. Each of the factors that the Supreme Court has told us to consider when determining whether someone is “in custody” under Miranda, except one, point toward the conclusion that Smith was in custody. And the admonishments that he was not under arrest were of basically no use to Smith — two were provided four hours before he confessed, and the third conveyed the opposite mes *990 sage that the Court of Appeal interpreted it to convey.
The Supreme Court has instructed lower courts to weigh all of the circumstances surrounding an interrogation to determine whether it was “custodial.” See Howes, 132 S.Ct. at 1189. But the Court of Appeal brushed aside these circumstances in favor of a bright-line rule that verbal admonishments alone are sufficient to assure a reasonable person that he is “free to go”: “We think a reasonable person who is told repeatedly that he is not under arrest and that he is free to go would understand that he is not under arrest and that he is free to go.” Smith, 2010 WL 4233298, at *3. It then rejected every argument that Smith made by invoking the “fact” that he had been told, three times, that he was “not under arrest” and was “free to go.”
Smith first argued that a California Supreme Court case, People v. Ochoa, 19 Cal.4th 353, 79 Cal.Rptr.2d 408, 966 P.2d 442 (1998), supported his claim that he was “in custody” under Miranda. The Court of Appeal rejected Smith’s analogy to Ochoa, relying exclusively on the number of times the police had told Smith that he was free to go. It wrote: “The situation here is even more clear than [in] Ochoa because the appellant [Smith] was told specifically and repeatedly that he was not under arrest and that he was free to go. Like Ochoa we conclude a reasonable person in appellant’s position would understand he was free to go.” Smith, 2010 WL 4233298, at *3 (emphasis added).
Smith next argued that he was “in custody” because (1) he was taken to the police station in a patrol car and (2) he was interrogated for over four hours at the station. The Court of Appeal dismissed both facts as irrelevant on the ground that Smith had been told three times that he was “not under arrest.” It wrote: “While appellant rode to the police station in a patrol car, he did so only after agreeing to do so and after being told specifically that he was not under arrest.” Id. (emphasis added). The court explained that “[a]ny coercion that might otherwise have been present due to the length of the questioning was lessened by the fact that at three different points during that questioning, appellant was told that he was not under arrest.” Id. (emphasis added).
Finally, Smith argued that he was “in custody” because he had asked several times whether he could leave. In particular, he pointed to the conversation he had with Detective Pucci reproduced above. In this conversation, Smith asked Pucci if he could leave after he had finished the lie detector test. Pucci responded, “Hey, you know, I don’t know. Are you and Detective Mustard done talking?” In other words, Pucci suggested to Smith that he was not free to leave. But the Court of Appeal dismissed the relevance of this exchange on the same ground it dismissed Smith’s other arguments: “Pucci then went on to tell appellant that he was not under arrest. We think a reasonable person who is told that he is not under arrest would understand that he is not in custody.” Id. at *4 (emphasis added).
The Court of Appeal, in other words, dismissed every single one of Smith’s arguments as to why he was “in custody” under Miranda on the same ground. It held that none of his arguments was persuasive in light of the fact that Smith had been told repeatedly that he was not under arrest. This is not the law. A police officer cannot transform a clearly custodial interrogation into a non-custodial interrogation simply by telling a suspect that he is “not under arrest.” Such a rule would render Miranda a dead letter.
The California courts (and the California police academies) have interpreted California v. Beheler, 463 U.S. 1121, 103 S.Ct. *991 3517, 77 L.Ed.2d 1275, as authorizing such a rule. But Beheler does no such thing. In Beheler, the defendant had gone to the police station voluntarily “although the police specifically told [him] that he was not under arrest.” 463 U.S. at 1122, 103 S.Ct. 3517. He spoke to police officers for 30 minutes and then returned home. Id. He later challenged his statement as obtained in violation of Miranda, and the California Court of Appeal agreed, concluding that Beheler had been “in custody” during the interview. Id. at 1123, 103 S.Ct. 3517. The Supreme Court reversed. It held that the case was indistinguishable from Mathiason, 429 U.S. 492, 97 S.Ct. 711, in which a defendant had voluntarily gone to the police station and given a short interview. Id. at 1123-24, 103 S.Ct. 3517. The Court did not rely on — indeed, did not even mention, except in its initial discussion of the facts — the fact that Beheler had been told he was not under arrest.
The bright-line rule on which the Court of Appeal relied in this case finds no support in Beheler, nor in any other Supreme Court case. The cases that tell us what it means to be “in custody” under Miranda instruct us to consider all of the relevant circumstances in making that determination. See Fields, 132 S.Ct. at 1189; Alvarado, 541 U.S. at 663, 124 S.Ct. 2140; Thompson, 516 U.S. at 112, 116 S.Ct. 457. And Beheler, rather than announcing or applying a new rule, applied the same “totahty-of-the-circumstances” rule described in these later cases. See 463 U.S. at 1125, 103 S.Ct. 3517. Because the Court of Appeal “applie[d] a rule that contradicts the governing law set forth in [Supreme Court] cases,” its judgment was “contrary to” clearly established federal law, see Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), and Smith’s petition for a writ of habeas corpus should have been granted.
Miranda rests on the proposition that “custody” is an objective circumstance, something that courts can identify after the fact by looking at a relatively small number of fixed indicia. But the rule applied by the Court of Appeal allows police to render these indicia irrelevant. Under the Court of Appeal’s misreading of Beheler, “custody” is no longer an objective inquiry. Police officers can easily manufacture a finding that a suspect is not in “custody” — and thereby evade Miranda— even when every coercive factor we associate with custodial interrogation is present, and even when (as here) the suspect clearly does not feel free to leave. All they need to do is say the magic words: ‘You’re not under arrest.”
By permitting Smith’s conviction to stand, we effectively allow the police to remove unwarned confessions from Miranda’s reach by reciting a few short words. Nothing in Miranda, in Beheler, or in any other case sanctions such an unwise and unfair result.
* * *
This is a close case only because we are reviewing the decision of the Court of Appeal on habeas, under the deferential standard required by AEDPA. If this case had come to us on direct review, it would be easy. I regret that our court has declined to rehear this case en banc, but I understand, given its procedural posture, my colleagues’ reluctance to do so.
It may be that the only way to put a stop to “Beheler-ing,” as practiced by the police in California and as tolerated by the California state courts, will be to seek direct review by the United States Supreme Court. I have little doubt what the Court’s answer will be if the question is presented on direct rather than on collateral review. The sooner we get that answer the better.