**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| STACEY DANIELLA DYER, *Petitioner-Appellant,* v. TINA HORNBECK, *Respondent-Appellee.* | No. 10-15044 D.C. No. 1:09-cv-00150-OWW-SMS OPINION |

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, Senior District Judge, Presiding

Argued and Submitted
November 6, 2012—San Francisco, California

Filed February 6, 2013

Before: Robert D. Sack[*], Ronald M. Gould,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Sack;
Concurrence by Judge M. Smith

---

[*] The Honorable Robert D. Sack, Senior Circuit Judge for the U.S. Court
of Appeals for the Second Circuit, sitting by designation.

**SUMMARY***

### Habeas Corpus

Affirming the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging the admission of statements Dyer made to police, the panel concluded that fairminded jurists could disagree as to whether Dyer was "in custody" when she made certain disputed statements, and that the state court's decision therefore was not an unreasonable application of the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny.

Although the panel noted that Dyer's consent to speak with police may have been influenced by her limited detention while officers executed a search warrant at her home, the panel ultimately concluded that the state court's decision was objectively reasonable, where Dyer agreed to travel with detectives from outside her home to the police station to answer their questions, detectives permitted Dyer two unaccompanied breaks to the restroom during the interrogation, and one of the interviewing detectives told Dyer at the beginning of the interrogation that she was not under arrest and was free to leave at any time.

Concurring in the judgment, Judge M. Smith explained that had he been sitting on direct appeal in place of the state court, he would have concluded that Dyer was entitled to *Miranda* protections, but applying AEDPA's highly

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

deferential standard, the state court's decision was not an unreasonable application of clearly established Federal law.

## COUNSEL

Katherine L. Hart, Fresno, California, for Appellant.

William K. Kim, Deputy Attorney General, Fresno, California, for Appellee.

## OPINION

SACK, Senior Circuit Judge:

The petitioner-appellant, Stacey Daniella Dyer, appeals from the judgment entered on December 15, 2009, in United States District Court for the Eastern District of California (Oliver W. Wanger, *Judge*) denying her 28 U.S.C. § 2254 petition for a writ of habeas corpus. Dyer contends that the California Court of Appeal unreasonably applied clearly established Supreme Court precedent when it affirmed the trial court's decision to admit as evidence statements made by Dyer during a station-house interview. She maintains that the interview was a custodial interrogation under *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny, and that because detectives failed to deliver the *Miranda* warnings required in such circumstances, her statements should have been excluded. Because we conclude that fairminded jurists could disagree as to whether Dyer was "in custody" when she made the statements in dispute, we affirm the district court's denial of Dyer's application for habeas relief.

## BACKGROUND[1]

On May 19, 2004, a California state jury returned a guilty verdict against Dyer on charges of first degree felony murder, second degree robbery, and kidnaping in connection with the death of 19-year-old D.J. Hunter. The evidence adduced at trial tended to link Dyer and several other alleged participants to a chain of events in the early morning of March 22, 2002, which culminated in Hunter's killing.

Hunter's body was found at approximately 6:00 a.m. He had been shot three times in the head and placed in the bed of his own pickup truck, which had been set on fire. A local business owner found Hunter's cellular telephone nearby, and officers retrieved it later that day. Telephone records revealed a call to Dyer's apartment, which prompted the police to obtain a search warrant for her home in Fowler, California. Officers began executing the warrant at about 10:35 p.m. on March 28, 2002. Dyer was not home at that time, but she arrived five minutes later. The police officers locked her in the rear of a patrol car while they completed their search.

The events of the next six hours, adopted as the factual findings underlying the Court of Appeal's decision, were as follows:

---

[1] Except where noted, the following, largely-undisputed facts are drawn from the California Court of Appeal's opinion, *People v. Lopez et al.*, 2007 WL 738787, 2007 Cal. App. Unpub. LEXIS 1978 (Cal. Ct. App. Mar. 12, 2007). *See* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.").

[Detective] Chapman arrived at Dyer's apartment after the warrant had been executed. When he arrived, he found Dyer seated in the back seat of Deputy Simpso[n]'s patrol car, which was parked in the alley outside of Dyer's apartment. The doors to the patrol car were closed and Dyer could not open them from the inside of the back seat. Chapman could not recall if the car was unattended at the time he arrived. Chapman contacted Dyer and told her he was conducting an investigation. Neither Chapman nor his partner, Detective Rasmussen, was in uniform. They did not display a firearm to Dyer. Chapman asked her if she would mind coming to the sheriff's Division to speak to "us." She was agreeable. Dyer was transported to the Division and her interview began approximately 30 minutes later. She was in the patrol car for over an hour, at the apartment and in transit from her apartment in Fowler.

Dyer was never handcuffed nor was she told she was under arrest. At the outset of the interview, Dyer was told she was not in custody and she was free to leave. The interview room was approximately 15 feet by 15 feet. It contained chairs, a table, and a trash can. Dyer was not under the influence of drugs at the time of the interview. The interview lasted 3 hours and 45 minutes. Two breaks were taken during the interview, one at 1:54 a.m. and one at 3:01 a.m. During the

first break Dyer got up, left the room, walked to the restroom (approximately 30 yards away), used the restroom, and returned to the interview room. At each break, Dyer said that no promises or threats had been made to her. For the first hour and a half of the interview, Dyer denied all knowledge and involvement. She later admitted that she had some contact with D.J. on the evening of the 21st. Dyer said she wanted to go home. She was arrested.

During their interview of Dyer, the officers told her that they knew "pretty much" where she was and what she was doing. They told her that people had told them that she was the one that killed D.J.

*Lopez*, 2007 WL 738787, at *9–10, 2007 Cal. App. Unpub. LEXIS 1978, at *25–27.

Chapman also testified that although Dyer could have left the police station during either of the two breaks, by that time he believed he had probable cause to arrest her, and indeed would have had she attempted to leave. Testimony of Detective Mark Chapman, Transcript of *Miranda* Hearing, March 19, 2004, Petitioner's Excerpts of Record ("E.R."), vol. I, ex. 3, at 1776–77.

Before trial, Dyer moved to suppress her statements to the police. Based largely upon what the trial court saw as Dyer's apparent willingness to accompany the detectives to the station, and upon the detectives' indication at the beginning of the interview that she was neither under arrest nor in

trouble, the trial court denied the motion. Trial Court Ruling on *Miranda* Issue, March 25, 2004, E.R. vol. I, ex. 4, at 3001–05. At trial, the prosecution introduced lengthy excerpts of Dyer's interview. The prosecution argued that her statements tended to place her with Hunter on the morning of the murder, and that her tone of voice suggested evasion and lack of remorse. Closing Statement of Dennis Peterson, Deputy District Attorney, Trial Tr., May 17, 2004, E.R. vol. I, ex. 5, at 9287, 9290–92.

The jury found Dyer guilty of first degree felony murder, second degree robbery, and kidnaping, and the court sentenced her on June 17, 2004, to life imprisonment without the possibility of parole. On March 12, 2007, her direct appeal was denied on the merits by the California Court of Appeal, Fifth Appellate District, and on June 20, 2007, the California Supreme Court summarily denied her petition for review. Dyer's attempts to obtain habeas relief in the California state courts were similarly unsuccessful. On December 22, 2008, she timely filed this habeas petition under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of California. The district court adopted the findings and recommendation of Magistrate Judge Sandra M. Snyder on December 14, 2009, which recommended that the petition be denied and that a certificate of appealability not issue. *Dyer v. Hornbeek* [sic][2], 2009 WL 3273284, 2009

---

[2] The district court opinion appeared to refer to the respondent as "Hornbeek" in the case caption, and "Hornbeak" in the appearance of counsel, *see Dyer*, 2009 WL 3273284, at *1, 2009 U.S. Dist. LEXIS 94834, at *1, E.R. vol. II, ex. 30, at 1, but we are confident that the proper spelling is "Hornbeck," *see e.g.*, *Potter v. Hornbeck*, 133 S. Ct. 120 (2012).

U.S. Dist. LEXIS 94834 (E.D. Cal. Oct. 9, 2009). Dyer sought a certificate of appealability from this Court, which we granted on July 18, 2011.

## DISCUSSION

### A. Standard of Review

We review a district court's decision to grant or deny habeas relief *de novo*. *Bailey v. Hill*, 599 F.3d 976, 978 (9th Cir. 2010).

Dyer's petition for habeas corpus relief is governed by section 2254 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to 28 U.S.C. § 2254(d), as amended by AEDPA, a federal court may not grant an application for a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). "In applying these standards of review, we look to the last reasoned decision in the state court system," *Collins v. Runnels*, 603 F.3d 1127, 1130 (9th Cir. 2010) (quotation marks omitted), which in this case is the March 12, 2007 opinion of the California Court of Appeal.

**B.  Merits**

We granted a certificate of appealability to allow us to review Dyer's claim that "the trial court violated [her] constitutional right against self-incrimination and right to counsel by denying the motion to suppress [her] statements to the police."  Dyer argues that the state court's decision with respect to this issue was an unreasonable application of the Supreme Court's seminal decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny.

In *Miranda*, the Supreme Court established that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination," *id.* at 444, a requirement commonly satisfied by delivery to the defendant of the familiar "*Miranda* warnings."  But "[a]n officer's obligation to administer *Miranda* warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).  The Court of Appeal affirmed the trial court's finding that Dyer was not "in custody" at the time she made the relevant statements, and that *Miranda* therefore did not apply.

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement' of the degree associated with formal arrest.'" *Stansbury*, 511 U.S. at 322 (quoting *California v. Beheler*,

463 U.S. 1121, 1125 (1983) (per curiam)). The question is an objective one, which we have glossed as whether a "reasonable innocent person in such circumstances" would understand that she could refuse to answer officers' questions and leave. *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981); *see United States v. Kim*, 292 F.3d 969, 978 (9th Cir. 2002). "[W]hether a suspect is 'in custody' . . . presents a mixed question of law and fact," *Thompson v. Keohane*, 516 U.S. 99, 102 (1995), "calling for independent review in federal court," *id.*

The respondent's argument that Dyer was not in custody emphasizes three aspects of her encounter with the police: first, that Dyer agreed to travel with detectives from outside of her home in Fowler to the police station and to answer their questions; second, that detectives permitted Dyer two unaccompanied breaks to the restroom during the interrogation; and third, that one of the interviewing detectives said to Dyer, at the beginning of the interrogation, "And you understand that you're not in any trouble, you're not under arrest, and that you're free to leave at any time?" The respondent argues that a reasonable innocent person in these circumstances would have believed that she was free to stop answering the detectives' questions and go home. Both state courts rested their decisions, in large part, on these factors.

For the reasons carefully spelled out by Judge Smith in his concurrence, we are troubled by this conclusion. The notion that Dyer's trip to the police station was fully voluntary is questionable, because at the time she agreed to join the officers, she had been detained in a locked squad car for twenty minutes while detectives searched her home. True enough, as the respondent and the Court of Appeal have

explained, the fact that detectives were executing a search warrant provided an independent legal justification for that detention, at least insofar as the Fourth Amendment is concerned, *see Michigan v. Summers*, 452 U.S. 692, 705 (1981), and that justification no longer existed by the time the detectives sought Dyer's consent to interview her at the station. It rather strains our imagination, however, to think that the reasonable innocent person is likely to have the sort of facility with Supreme Court jurisprudence needed to understand that principle. *Cf. Kim*, 292 F.3d at 976–77 (explaining that "whether an individual detained during the execution of a search warrant has been unreasonably seized for Fourth Amendment purposes and whether that individual is 'in custody' for *Miranda* purposes are two different issues").

As to the other factors -- the unaccompanied breaks and the pre-interview assurance that Dyer was not in trouble -- we do not deny their relevance. But we also acknowledge other aspects of the interrogation -- its four-hour duration, the time of night at which it was conducted, the distance between the police station and Dyer's home, and the extent to which Dyer was confronted with evidence of her own guilt -- on the other side of the scale. *See id.* at 974 (identifying factors relevant to custody determination).

Despite our doubts, however, we are bound by AEDPA's exacting requirements. What section 2254(d)(1) says, as relevant here,[3] is that habeas relief is appropriate only to

---

[3]  Insofar as Dyer argues that the Court of Appeal's decision was either "contrary to" Supreme Court precedent, 28 U.S.C. § 2254(d)(1), or that it rested on an "unreasonable determination of the facts," *id.* § 2254(d)(2), those arguments are without merit. The Court of Appeal correctly

remedy a state court's "unreasonable application of" clearly established Supreme Court precedent. We are thus required to affirm the district court's denial of Dyer's petition, unless the state court's decision in the matter was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011). We conclude that Dyer cannot satisfy that standard.

We think that a fairminded jurist could, on this record, find that Dyer was not in custody, because many presumably fairminded jurists have indeed so found on facts similar to these. Although "only Supreme Court holdings are binding on state courts," *Rodgers v. Marshall*, 678 F.3d 1149, 1155 (9th Cir. 2012), "[c]ircuit precedent may provide persuasive authority for purposes of determining whether a state court decision is an 'unreasonable application' of Supreme Court precedent." *Id.* (quotation marks omitted). And there is authority -- from the Supreme Court, this Court, and from other circuits -- that treats the combination of factors relied upon by the respondent as precluding a finding that Dyer was in custody.

In *Oregon v. Mathiason*, 429 U.S. 492 (1977), for example, the Supreme Court explained that the suspect "came voluntarily to the police station, where he was immediately

---

identified the governing legal principles, and its decision does not contradict a Supreme Court holding on "materially indistinguishable" facts. *Moses v. Payne*, 555 F.3d 742, 751 (9th Cir. 2008). Nor has Dyer presented "clear and convincing" evidence rebutting the presumption of correctness that attaches to the state court's determinations of the facts. *See* 28 U.S.C. § 2254(e)(1).

informed that he was not under arrest" in finding that he was not in custody. *Id.* at 495. We reasoned similarly in this Court's en banc opinion in *United States v. Crawford*, 372 F.3d 1048, 1059–60 (9th Cir. 2004) (en banc). There, we noted that the "[d]efendant agreed to go to the FBI office," and we explicitly labeled as "most significant for resolving the question of custody" the fact that the "[d]efendant was expressly told that he was not under arrest." *Id.* We rejected the defendant's argument, which is not unlike Dyer's, that "because [the suspect] was detained during [a] parole search and officers had entered his bedroom with weapons drawn, his later questioning at the FBI office amounted to custodial interrogation." *Id.* at 1059.

The case law contains many other examples of courts relying on similar factors to conclude that a suspect was not in custody. *See, e.g.*, *Beheler*, 463 U.S. at 1122 (noting that the defendant "voluntarily agreed to accompany police to the station house"); *Bains v. Cambra*, 204 F.3d 964, 972 (9th Cir. 2000) (relying, in context of a § 2254 petition, on fact that petitioner "either . . . himself suggested that his questioning by the police continue at the police station or he simply chose not to object when the police suggested [it]"); *United States v. Bassignani*, 575 F.3d 879, 886 (9th Cir. 2009) ("We have consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time."); *United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005) ("[The suspect] was told that his cooperation was voluntary and that he was free to terminate the interview at any time."); *United States v. LeBrun*, 363 F.3d 715, 722 (8th Cir. 2004) (en banc) ("[T]he defendant was not in custody because, among other things, the officers told him that he was free to leave and that he would not be arrested . . . .").

Our independent consideration of other factors relevant to the custody determination confirms that the result reached by the Court of Appeal was objectively reasonable. The principal circumstances relied upon by Dyer in arguing that she was in custody were mitigated somewhat by still other aspects of her encounter.

One such consideration is the physical surroundings of the interrogation. *See Kim*, 292 F.3d at 974. It is true that Dyer's interrogation took place in a police station, which is, of course, precisely the sort of setting the Supreme Court had in mind when it decided *Miranda*. But the Supreme Court has since "explicitly recognized that *Miranda* warnings are not required simply because the questioning takes place in the station house . . . ." *Beheler*, 463 U.S. at 1125 (quotation marks omitted). It seems to us to follow that circumstances may soften the police station's inherently intimidating atmosphere, or at least that detectives may take steps so as not to amplify it. That was arguably so here. Dyer was interviewed in a nondescript, fifteen-by-fifteen foot room -- small, but not oppressively so -- in what appears to have been a public-facing area of the station house. The Court of Appeal noted that during a break, Dyer "got up, left the room, walked to the restroom (approximately 30 yards away), used the restroom, and returned to the interview room," *Lopez*, 2007 WL 738787, at *9, 2007 Cal. App. Unpub. LEXIS 1978, at *26, and Detective Chapman testified that she could have exited the station from there, Testimony of Detective Mark Chapman, Transcript of *Miranda* Hearing, March 19, 2004, E.R., vol. I, ex. 3, at 1776–77. So it is not as though Dyer was locked in the bowels of the station house, with no idea which way was out. Indeed, nothing in the record suggests that the detectives did anything to heighten her sense of seclusion.

Another relevant consideration is the tone of the interrogation. *Bassignani*, 575 F.3d at 884. Although "[w]e have found a defendant in custody when the interrogator adopts an aggressive, coercive, and deceptive tone," *id.*, the Supreme Court has also cautioned generally that "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns," *Illinois v. Perkins*, 496 U.S. 292, 297 (1990) (citing *Mathiason*, 429 U.S. at 495–96). We do not read the transcript of the interrogation here to suggest the sort of tone that would communicate to a reasonable innocent person that her participation was not voluntary. To be sure, Dyer was sporadically confronted with accusations and elliptical references to evidence of her guilt.[4] But this tone was not pervasive. More often, the detectives employed the sort of tactics referred to in *Perkins*, which work for the very reason that they cultivate in the suspect a sense of trust and voluntariness, false though that sense may be. The transcript also reveals lengthy portions of the interrogation that took a purely investigatory tone, in addition to repeated confirmations that detectives had not made threats or promises to Dyer. *See* Tr. of Pet'r's Interview, March 29, 2002, E.R. vol. I, ex. 2, at 35, 49, 51, 77. The tone of the interview therefore does not weigh as heavily in favor of a custody determination as Dyer suggests.

---

[4] Among them: "Other people have said, have told us that you're the person that killed him," Tr. of Pet'r's Interview, March 29, 2002, E.R. vol. I, ex. 2, at 34; "I know you're scared. I can see your, your heart's pumping pretty fast right now, and your heart's not pumping fast because you didn't do anything. We know you did, and it's okay," *id.* at 45; "At 1:51 a.m. on Friday morning there was a phone call to your residence from D.J.'s telephone, it's right here," *id.* at 40. *See also id.* at 13, 29–30, 37.

Ultimately, we are persuaded that the Court of Appeal's understanding of the foregoing principles in the context of this case, and its conclusion that a reasonable innocent person in Dyer's position would have understood herself to be free to ignore the detectives' inquiries and leave, are reasonable. So even if we think that Dyer's consent to speak with police may have been influenced by her limited detention while the search was being executed, or that the force of the detectives' promise that Dyer was free to leave may have been blunted by other aspects of the encounter, we cannot reject the Court of Appeal's ultimate decision. "[Section] 2254(d)'s highly deferential standard for evaluating state-court rulings . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citations and internal quotation marks omitted). Giving the Court of Appeal that benefit here, we affirm the judgment of the district court denying Dyer's application for habeas relief under 28 U.S.C. § 2254.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

---

M. SMITH, Circuit Judge, concurring in the judgment:

Three California Court of Appeal justices found that Stacey Dyer was not "in custody" when she was interrogated for nearly four hours in the dead of night at a police station located thirty minutes from her home. For the reasons discussed in this concurrence, were I sitting on direct appeal in the place of one those justices, I would have decided the

custody issue differently. Because the habeas appeal before us is governed by the Antiterrorism and Effective Death Penalty Act of 1996, however, I am bound by controlling law to concur in the judgment denying Dyer's petition for relief. *See* 28 U.S.C. § 2254. Specifically, I am bound to concur in the judgment because we must apply a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (citation and internal quotation omitted). Moreover, I do not find that my state colleagues' conclusion rests on an "unreasonable application of clearly established Federal law," 28 U.S.C. § 2254(d)(1), or that the state court's decision in this case was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770 , 786-87 (2011). Still, I believe Dyer was entitled to the protections afforded by *Miranda v. Arizona*, 384 U.S. 436 (1966).

The State argues otherwise, and contends that Dyer was not in custody because she: (1) agreed to travel to the police station to answer questions; (2) was permitted two unaccompanied breaks to the restroom during a nearly four-hour-long interrogation; and (3) was told once, at the very beginning of the interrogation, "And you understand that you're not in any trouble, you're not under arrest, and that you're free to leave at any time?" The State puts far too much weight on each factor, while entirely ignoring the countervailing factors that support Dyer's position.

## A.  Dyer's "Voluntary" Cooperation

The State claims Dyer was not in custody because she voluntarily agreed to travel to the police station to answer questions.  If Dyer did consent, this fact would be highly relevant to the custody analysis.  *See, e.g.*, *Oregon v. Mathiason*, 429 U.S. 492 (1977) (per curiam); *California v. Beheler*, 463 U.S. 1121 (1983) (per curiam); *but cf. United States v. Kim*, 292 F.3d 969, 975 (9th Cir. 2002) ("Voluntary initiation of contact with the police cannot be, under any circumstances, the end of the inquiry into whether a defendant was 'in custody' during [an] encounter.").  But there is simply no reason to believe Dyer truly consented to questioning here, where Detective Chapman solicited Dyer while she was already locked in the back of a police car, and had been detained there for nearly 30 minutes.

The significance of Dyer's detention in the back of the patrol car cannot be overstated, as it serves to substantially distinguish Dyer's case from those where suspects unambiguously volunteered to answer questions.  *See, e.g.*, *Mathiason*, 429 U.S. at 493; *Beheler*, 463 U.S. at 1122; *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc).  The defendant in *Mathiason*, for instance, agreed to submit to police questioning after the investigating officer left his business card and a note at the defendant's apartment asking the defendant to call him.  429 U.S. at 493.  The next day Mathiason called the officer and agreed to come to the police station to answer questions.  *Id.*  That Mathiason, unlike Dyer, truly consented to questioning cannot be denied—he was under no obligation to call the officer, let alone come to the police station.

*Beheler* and *Crawford* are similarly distinguishable: In both of those cases, the defendant was *in his own home* when he agreed to accompany police officers to the station house. *Beheler*, 463 U.S. at 1122; *Crawford*, 372 F.3d at 1051. This distinction is critical because a suspect is far less likely to be intimidated or coerced into talking to the police when she is in the familiar surroundings of her own home. *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008) ("The element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings.") (citation omitted). That suspects like those in *Beheler* and *Crawford* can, at least theoretically, ask the police to leave their property is highly significant in evaluating the ultimate voluntariness of their decisions to cooperate with the authorities. *See generally id.* at 1083–84 (noting that "courts have generally been much less likely to find that an interrogation in the suspect's home [is] custodial in nature.") (citations omitted).

In contrast to the suspects in *Mathiason*, *Beheler* and *Crawford*, Dyer's "consent" was obtained while she was already under total police control. Thus for Dyer, refusing the police's invitation would have required more than simply asking the police to leave or not phoning back, but affirmatively convincing the police to release her from the back of the locked squad car. And even then, Dyer may not have been "free to leave" because the police could have denied her entry to her apartment until their ongoing search for evidence was complete. *See, e.g.*, *Illinois v. McArthur*, 531 U.S. 326, 332 (2001) (holding that the police may reasonably deny a suspect entry to his own home to prevent the destruction of evidence). As we have recognized, "[t]o be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home." *Craighead*, 539 F.3d at 1083.

A reasonable person in Dyer's position—already removed from her home and detained in a locked police vehicle around 11:00 P.M.—would likely have felt that a trip to the police station was inevitable, and certainly would not have felt free to refuse the police's request to talk.

## B. Dyer's Capacity to Leave

The State next argues that *Miranda* warnings were unnecessary because Dyer was permitted two unaccompanied breaks to the restroom during her lengthy interrogation. Specifically, the State argues that because Dyer could have exited the police station (mid-interview) out of an unlocked side door, she was not in custody. The State's argument misses the mark for several reasons.

First, there is no evidence that Dyer (or a reasonable person in Dyer's position) actually knew she could exit the station house.[1] But even assuming Dyer knew she could leave, she had nowhere to go—Dyer was questioned between midnight and 4 a.m., a 30 minute drive from her home, and without any means of transportation. Although similar in some ways, Fresno is not Manhattan, where taxis and buses run all night and residents can reasonably hope to obtain a

---

[1] The majority notes that "nothing in the record suggests that the detectives did anything to heighten [Dyer's] sense of seclusion." While true, there is similarly nothing in the record to suggest that Dyer knew she could easily leave.

safe ride home.[2]   The State's claim that a female suspect, under the circumstances here, stranded far from her home in the dead of night would simply walk out of a police interview strains credulity, even if the front door was wide open.

More importantly, however, the fact that Dyer theoretically could have exited the station is largely irrelevant.   Whether Dyer was confined in a labyrinthine prison or a minimalist station house, the question is not whether a suspect was theoretically *capable of leaving*, but whether a reasonable person in the suspect's position would have *felt free to leave*. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).   Here, for the reasons already indicated (*i.e.*, the lateness of the hour, the distance from her home, and her lack of transportation), Dyer was not free to leave.   And if this conclusion were in any doubt, the fact that Chapman and his partner had spent nearly two hours accusing Dyer of murder before she was allowed to take her first break confirms it. *See Kim*, 292 F.3d at 974 (finding "the extent to which the defendant is confronted with evidence of guilt" highly relevant to the *Miranda* determination).   Before stopping around 2 a.m., the detectives had already told Dyer, among other things, that:  "people have picked you out of a line-up, they know it was you"; "you have been implicated in this crime, and we just need to know the story"; "what they're saying is that you guys are responsible for DJ's death"; "you were handed the weapon and they told you to do it"; and "you've been implicated as being responsible for the death of

---

[2]   There is nothing new about considering geography when determining the appropriate level of constitutional protection.  For example in *Illinois v. Wardlow*, the Supreme Court found particularly relevant the fact that the defendant took flight in an "area known for heavy narcotics trafficking."  528 U.S. 119, 124 (2000).

D.J., and it's very serious." Confronted with such momentous allegations of guilt, no reasonable person would have felt free to turn an unaccompanied trip to the restroom into a full-blown escape attempt.

## C. Advisement Dyer Was Free to Leave

Finally, the State argues that Dyer was not in custody because the detectives told her once, before the interview began, that "you're not in any trouble, you're not under arrest, and that you're free to leave at any time." As the majority properly recognizes, such an advisement is extremely relevant, and we have previously held that the fact that the "[d]efendant was expressly told that he was not under arrest" is "most significant for resolving the question of custody[.]" *Crawford*, 372 F.3d at 1059–60. Still, "the mere recitation of the statement that the suspect is free to leave or terminate the interview. . .does not render an interrogation non-custodial *per se*." *Craighead*, 539 F.3d at 1088; *see also United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) ("There may be situations where the restraints placed on a suspect's freedom are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview[.]") (citation omitted). Rather, to determine whether Dyer was in custody we must again consider whether a reasonable suspect would have felt at liberty to terminate the interview and leave. *Craighead*, 539 F.3d at 1088. Again, the answer is no.

Dyer concedes that Chapman told her that she was "free to leave," and the transcript confirms that Dyer acknowledged

Chapman's statement.[3]  Nevertheless, several facts lead me to conclude that Dyer could have reasonably believed she was not free to leave, notwithstanding that Detective Chapman told her she was.  For instance, immediately prior to Chapman's advisement, Dyer had been detained in the back of a police vehicle for roughly one hour in the aggregate, and had witnessed Sheriff's Deputies search her home.  Thus, by the time the interview started, Dyer certainly knew that the police considered her a suspect in a criminal investigation, and given the night service of the search warrant and the unusual hour of the interview itself, Dyer surely knew the crime being investigated was quite serious.  *See generally Rodriguez v. Superior Court*, 245 Cal. Rptr. 617, 624–25 (Cal. Ct. App. 1988) (describing the heightened standard for obtaining nighttime service of a search warrant); *see also* Cal. Penal Code § 1533.  At the very outset of the interrogation then, Chapman's assurance that Dyer was "free to leave at any time" likely rang false.

But even assuming that a reasonable person in Dyer's position would have initially believed that she was free to leave, there is no reason to suspect that such a belief would have persisted throughout the entirety of the interview.  *See, e.g.*, *Crawford*, 372 F.3d at 1061 (holding that a suspect was not in custody where he was "*repeatedly* told" that he was not under arrest and was free to leave) (emphasis added).  Within minutes of telling Dyer she was free to leave, detectives informed her that "you've been implicated by several people as being involved in this, and that's why we're here tonight."  By the time an hour had elapsed, the police had made at least

---

[3]  "Q: Ok.  And you understand that you're not in any trouble, you're not under arrest, and that you're free to leave at any time?  A: Uh huh (affirmative)."

*20 more* references to Dyer's involvement in D.J. Hunter's death.  Put simply, well before Dyer made any incriminating statements, a reasonable person in her position would have known that, despite Chapman's earlier assertion, she was not free to leave.  Thus, Dyer was "in custody" and was entitled to receive *Miranda* warnings.