*992 CALLAHAN, Circuit Judge,
and M. SMITH, Circuit Judge,
concurring in the denial of rehearing en banc:
With all due respect to our dissenting colleague, we disagree with his characterization of the state appellate court’s decision, description of the circumstances surrounding Jovan’z Smith’s interview, and legal conclusions. Out of fairness to all concerned, including the California jurists who reviewed Smith’s case on appeal, we offer this concurrence in response to his dissent.
I.
In this case, the Miranda inquiry arises within the context of habeas review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). “An officer’s obligation to give a suspect Miranda warnings before interrogation extends only to those instances where the individual is ‘in custody.’ ” United States v. Kim, 292 F.3d 969, 973 (9th Cir.2002). In determining whether a suspect is in custody, “[t]wo discrete inquiries are essential.” Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). First, a court must determine “what ... circumstances surround[ed] the interrogation.” Id. Second, a court must decide whether “a reasonable person [in those circumstances would] have felt he or she was not at liberty to terminate the interrogation and leave.” Id. “The custody determination is objective and is not based upon ‘the subjective views of the officers or the individual being questioned.’ ” United States v. Bassignani, 575 F.3d 879, 883 (9th Cir.2009); see also Stansbury v. California, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Courts have identified numerous circumstances to be pertinent in assessing the custody question. See Howes v. Fields, — U.S. -, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012); Kim, 292 F.3d at 974.
On direct appeals, Miranda claims present mixed questions of law and fact that we review de novo. United States v. Cazares, 788 F.3d 956, 979 (9th.Cir.2015). In this case, however, we are bound by AED-PA. See Yarborough v. Alvarado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (applying AEDPA on habeas review of a challenge based on Miranda). AEDPA authorizes the grant of a state prisoner’s petition for a writ of habeas corpus when the relevant state-court decision was (1) “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court” or (2) “based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). The Court must “look to the last reasoned state court adjudication on the .merits of [Smith’s] Miranda claim, which was the decision of the California Court of Appeal.” Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir.2013).
A state court decision is “contrary to” federal law within the meaning of § 2254(d)(1) if “the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law,” or “the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court].” Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). “Thus, the ‘contrary to’ prong requires a direct and irreconcilable conflict with Supreme Court precedent.” Murray v. Schriro, 745 F.3d 984, 997 (9th Cir.2014).
A state court decision is an “unreasonable application” of Supreme Court precedent within the meaning of § 2254(d)(1) if *993 “the state court identifies the correct governing legal rule from [the Supreme] Court’s eases but unreasonably applies it to the facts of the particular state prisoner’s case,” or “the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.” Williams, 529 U.S. at 407, 120 S.Ct. 1495. The Supreme Court has repeatedly emphasized that “ ‘an unreasonable application of federal law is different from an incorrect application of federal law.’ ” Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011). “The deferential standard imposed under AEDPA cloaks a state court’s determination with reasonableness, so long as ‘fairminded jurists could disagree’ as to whether a claim lacks merit.” Murray, 745 F.3d at 998 (quoting Alvarado, 541 U.S. at 664, 124 S.Ct. 2140). Thus, “a habeas court must determine what arguments or theories supported or ... could have supported! ] the state court’s decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.” Harrington, 131 S.Ct. at 786.
Importantly, state courts are given even “more leeway” in cases like this one, where the rule applied is general in nature, requiring a case-by-case assessment based on the totality of the circumstances. Alvarado, 541 U.S. at 664, 124 S.Ct. 2140. Emphasizing the stringency of § 2254(d)(1), the Supreme Court has cautioned that “even a strong case for relief does not mean the state court’s contrary conclusion was unreasonable.” Harrington, 131 S.Ct. at 786; see also Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).
II.
Our dissenting colleague believes that habeas relief should have been granted for two reasons, which we address in turn.
A.
The dissent’s primary concern is that the state appellate court applied “a bright-line rule that a suspect who has been told repeatedly'that he is ‘not under arrest’ is not ‘in custody’ under Miranda.” The dissent broadly states that all California courts apply this bright-line rule rather than the “totality-of-the-circumstances” test required by Miranda and its progeny.
We disagree with the dissent’s characterization of the state appellate court’s decision. While the court placed great weight on the fact that Smith was repeatedly told he was not under arrest, as the Supreme Court and we have done in similar cases, it did not impose a “bright-line rule.” Nowhere in its decision does the state appellate court set out a legal standard that is contrary to the totality-of-circumstances test. Rather, it correctly recites the two-part custody test: “First, what were the circumstances surrounding the interrogation, and second, given those circumstances, would a reasonable person have felt he was not at liberty to terminate the interview and leave.” People v. Smith, No. A125912, 2010 WL 4233298, at *2 (Cal. Ct.App. Oct. 27, 2010) (unpublished).
Nor does the state appellate court’s application of the custody test belie a different standard. The state appellate court’s decision set the stage of the interview and referenced the video footage. The court mentioned several factors that are indicative of custody, including how Smith was summoned and brought to the police station, the removal of Smith’s backpack and phone, aspects of the interview’s surroundings, the duration of the questioning, and *994 some statements made during the interrogation. Other circumstances that were not mentioned by, the state appellate court may also weigh in favor of the view that Smith was in custody, but a court is not required to list each such circumstance in its unpublished decision. See Taylor v. Maddox, 366 F.3d 992, 1001 (9th Cir.2004) (“[S]tate courts are not required to address every jot and tittle of proof suggested to them, nor need they ‘make detailed findings addressing all the evidence before [them].’ ”) (quoting Miller-El v. Cockrell, 537 U.S. 322, 347, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)). Similarly, the state appellate court was not required to marshal all countervailing circumstances in order to deem the interview non-custodial. The Supreme Court did not do so after mentioning numerous coercive circumstances in its brief per curiam decision reversing the California appellate court in California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).
If the state appellate court had created and applied a “bright-line rule” instead of employing the totality-of-circumstances test, it would have been unnecessary for the court to have addressed all of these circumstances suggesting custody. Moreover, the state appellate court did not uniformly dismiss these circumstances based on the so-called Beheler admonishments. For example, the court compared the length of the interview with the length of interviews previously found not to be custodial by the California Supreme Court. Smith, 2010 WL 4233298, at *3 (“While the interview was lengthy (about 3.5 hours to the point where appellant began making incriminating statements), it was similar in length to one where our Supreme Court found a defendant not to be in custody. (Cf. People v. Leonard (2007) 40 Cal.4th 1370, 1400, 58 Cal.Rptr.3d 368, 157 P.3d 973 [a defendant who was questioned for 3.5 hours was not in custody].)”). The state appellate court also addressed Smith’s argument that his phone and backpack had been confiscated. The court found that it was “far from clear whether the police took [the] backpack.” Smith, 2010 WL 4233298, at *4. It concluded that the importance of this circumstance was “minor,” because, “[i]n any event, ... nothing ... would have prevented [Smith] from simply asking that they be returned.” Id. The state appellate court did not deem such coercive circumstances to be irrelevant in light of the Beheler admonishments. It found them “lessened by the fact that at three different points during that questioning, appellant was told that he was not under arrest.” Id. at *3.
Thus, we disagree with the dissent’s argument that the custody test employed by the state court was contrary to that required by clearly established law. The state appellate court invoked and then applied the totality-of-circumstances custody test. Indeed, the dissent’s objection that the state appellate court viewed the Beheler admonishments as “virtually conclusive evidence” appears to concede that the court did not apply a “bright line rule.”
Even if we were to agree with the dissent’s characterization of the state appellate court’s decision, which we do not, relief must be denied. There is no clearly established Supreme Court law that a Be-heler admonishment is not due significant weight in the custody test. Rather, the Supreme Court and our court also “have consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time.” United States v. Bassignani, 575 F.3d 879, 886 (9th Cir.2009); see also Howes, 132 S.Ct. at 1185 (“Most important, [respondent] was told at the outset of the interrogation, and reminded thereafter, that he was free to leave.... ”); Beheler, 463 U.S. at 1122, 103 S.Ct. 3517; Ore *995 gon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir.2004) (en banc) (“Perhaps most significant for resolving the question of custody, Defendant was expressly told that he was not under arrest....”); Dyer v. Hornbeck, 706 F.3d 1134, 1136-40 (9th Cir.2013); United States v. Norris, 428 F.3d 907, 912 (9th Cir.2005).
Indeed, it is common sense to give significant weight to the fact that a person was repeatedly told that he was not under arrest in evaluating whether a reasonable person in his circumstances would have thought himself to be under arrest. The dissent paints a picture of California police officers nefariously gaming the system by telling people that they are not under arrest. But there is no better way to communicate that a person is not under arrest than by telling him. As the panel explained in its memorandum disposition and Judge Watford elaborated in his concurrence, “[t]his is not to say that an interrogation begun with a so-called ‘Beheler advisement’ cannot become custodial as that interrogation drags on and coercive circumstances accumulate.” Rather, “on the facts presented, the state appellate court did not unreasonably conclude that the custodial rubicon had not been crossed by the time Smith first confessed, and thus the prophylactic procedural measures adopted by the Supreme Court in Miranda had not been triggered.”
B.
For the reasons stated in our memorandum disposition, we also disagree with the dissent’s view that the state court unreasonably applied the custody test.
We add that other circumstances that were not mentioned by the state appellate court also weigh against the view that Smith was, in custody. For example, Smith was never handcuffed. The door to the interview room was unlocked and was at times left open, including during the time period after the lie detector test had been administered. Although Smith was brought from school to the police station by a uniformed officer, that officer was a “youth services officer” who was assigned to Vallejo High School, and thus her presence was likely neither extraordinary nor particularly intimidating. The interrogating detectives were dressed in plain clothes and were courteous and relaxed for the substantial majority of the interview. Smith left the interview room once during the pre-Miranda interview, albeit only for about 1 minute and 20 seconds. Smith was given three breaks during the pre-Miranda interview, during which he was left alone in the room for 40, 2, and 20 minutes. While left alone, Smith can be seen on the videotape practicing for the interview, which may be interpreted as evidence that Smith deliberately remained at the station in order to dispel suspicion of him. Smith signed forms consenting to the lie detector test and to the search of his room for the clothes he was wearing at the time of the incident. As the state appellate court noted, the California Supreme Court has “ruled that someone who had signed such a- statement would understand that he was not in custody.” Smith, 2010 WL 4233298, at *3 (citing People v. Ochoa, 19 Cal.4th 353, 402, 79 Cal.Rptr.2d 408, 966 P.2d 442 (1998)).
Additionally, after Detective Pucci administered the lie detector test, he shook Smith’s hand and stated, “If I .don’t get a chance to see you again, good luck to you, and I hope everything works out for you, alright.” He then handed Smith his card and stated “You got any questions, concerns about anything, that’s my desk number there. Alright?” A reasonable person would view this interaction as an indication *996 that Smith was free to leave. At the very-least, the state court’s determination that a reasonable person would feel free to leave was not objectively unreasonable.
Furthermore, we cannot agree with the dissent’s statement of some facts. Most notably, we cannot conclude that the state appellate court was of the mistaken view that Smith was told three times that he was “free to go.” We know that Smith’s second advisement that he was not under arrest was accompanied by a statement that he was “free to go,” but that his third advisement that he was not under arrest did not include such a statement. Although the record does not indicate exactly what Smith was told when he was approached at school, the state appellate court opined that Smith was told that “he was not under arrest and [was] asked whether he was willing to go to the police station to answer some questions.” Smith, 2010 WL 4233298, at *1.[1] Regardless of how each advisement is characterized, this counting exercise is of no consequence, as the state appellate court was not objectively unreasonable in viewing the three ad-visements that Smith was “not under arrest” as having conveyed messages that Smith was free to go.
We also note that Smith and the dissent overstate how much several factors weigh in- favor of the view that Smith’s pre-warning confession was custodial. Although the pre-warning interrogation was long, we cannot conclude on AEDPA review that it was “a marathon session designed to force a confession.” Bassignani, 575 F.3d at 886 (quotation marks omitted); cf. Dyer, 706 F.3d at 1136 (nearly four-hour nighttime interrogation). While Smith was brought to the police station in a police car, he joined the officer voluntarily and had a friendly conversation along the way. See Beheler, 463 U.S. at 1122, 103 S.Ct. 3517; Mathiason, 429 U.S. at 495, 97 S.Ct. 711 (“He came voluntarily to the police station....”); Crawford, 372 F.3d at 1059 (emphasizing that the defendant “agreed to accompany” the officers). And while the accusatory nature of an interview is an important circumstance to consider, Smith’s interrogation did not become custodial simply because the officers questioned .Smith’s veracity, confronted him with evidence of his guilt, and promised leniency. See Mathiason, 429 U.S. at 493, 97 S.Ct. 711 (officers told suspect that his fingerprints had been found at the scene and that “his truthfulness would possibly be considered by the district attorney or judge”); Stansbury, 511 U.S. at 325, 114 S.Ct. 1526 (telling a person he is a “prime suspect” does not necessarily mean he is under arrest because “some suspects are free to come and go until the police decide to make an arrest”).[2] Indeed, the detectives generally questioned Smith in a friendly, courteous tone, and their posture was relaxed. At one point, Smith can be seen laughing and joking with Detective Pucci about mutual acquaintances. The officers also permitted Smith to give narrative answers and “appealed to his interest in telling the truth and being helpful.” Alvarado, 541 U.S. at 664, 124 S.Ct. 2140. *997 A fairminded jurist could view many statements that Smith labels as implicit threats and promises as explanations of the importance of truth and as explaining the differences between an intentional and a negligent act.
We recognize that the state appellate court did not address Detective Pucci’s comment that Smith could not “leave the room lying bro.” But the comment appears to have been directed at Smith’s claim that he changed the channel on the television to watch cartoons with the baby, which the detectives said was inaccurate.[3] A fairminded jurist could conclude that a reasonable person would not have interpreted this statement literally, particularly in the context of the previous advisements that Smith was not under arrest. Instead, the statement could fairly be viewed as an appeal to the importance of truth.
Additionally, we note that the state appellate court acknowledged that Detective Pucci’s third advisement that Smith was not under arrest was less than clear. But the court concluded that to the extent that Detective Pucci’s advisement was ambiguous in context, notwithstanding the previous advisement that Smith was free to go, a reasonable person would have asked for clarification. Smith did not ask for clarification and did not seek to leave after the lie detector test was administered. We cannot conclude that the state appellate court’s view was objectively unreasonable.
We acknowledge that this is a close case. Perhaps there are other circumstances, beyond those mentioned by Smith, the dissent, and the state appellate court, that weigh in favor of the view that Smith was in custody. But on AEDPA review, “even a strong case for relief does not mean the state court’s contrary conclusion was unreasonable.” Harrington, 131 S.Ct. at 786. The list of decisions reversing us for ignoring this rule is long.[4] As the panel, district judge, and magistrate all agreed, a fairminded jurist could hold, as did the three judges on the state court of appeal, that Smith was not in custody when he first confessed to killing the baby. That compels a denial of relief under AEDPA.

. Indeed, the state appellate court’s specific discussions of the first and third advisements demonstrate that, notwithstanding a prefatory sentence suggesting otherwise, the court was not under the impression that Smith was told he was free to go three times.

. The Supreme Court has explained that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question.” Mathiason, 429 U.S. at 495, 97 S.Ct. 711.

.As explained by the district court, the exchange was as follows:
D. MUSTARD: You didn't change the station.
SMITH: Huh?
D. MUSTARD: You didn't change the station.
SMITH: I did change the station.
D. MUSTARD: You did not change the station. I just was at the house and do you know what channel the TV is on — BET.
SMITH: She turned — I did turn the station. I had a remote. I turned it.
D. MUSTARD: You didn't turn the station Javon'z. [sic.]
D. PUCCI: Hey ...
D. MUSTARD: Don’t lie man.
D. PUCCI: ... Just ...
D. MUSTARD: You can't leave this room lying bro.
D. PUCCI: ... What happened out there man? Just tell me did the baby do something? Was there some circumstance behind this whole thing?
SMITH: No.

.See, e.g., Dayis v. Ayala, - U.S. -, 135 S.Ct. 2187, 2202, 192 L.Ed.2d 323 (2015) (faulting us for having "misunderstood the role of a federal court in a habeas case”); Harrington, 131 S.Ct. at 785 (reversing us and explaining that "even a strong case for relief does not mean the state court’s contrary conclusion was unreasonable”); Alvarado, 541 U.S. at 665, 124 S.Ct. 2140 (reversing us and explaining we were "nowhere close to the mark” in concluding that a state court unreasonably applied the custody test); Lockyer, 538 U.S. at 75, 123 S.Ct. 1166 (reversing us for “fail[ing] to give proper deference to state courts by conflating error (even clear error) with unreasonableness”).